Luis E. LINAN, M.D. and Eastside Women's Healthcare Center, P.A., Appellants,

v.

Corina A. ROSALES, Appellee.

No. 08–00–00540–CV.

Court of Appeals of Texas, El Paso.

March 31, 2004.

Rehearing Overruled June 2, 2004.

Karen L. Landinger, Ray, Valdez, McChristian & Jeans, El Paso, for Appellants.

Evelina Ortega, Caballero & Ortega, L.L.P., El Paso, for Appellee.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

Appellants Luis E. Linan, M.D. and Eastside Women's Healthcare Center appeal a jury verdict of negligence in favor of Appellee Corina A. Rosales for Dr. Linan's alleged malpractice of failure to timely diagnose Ms. Rosales' breast cancer which caused her to have a mastectomy rather than breast conserving therapy. On appeal, Appellants raise four issues: (1) whether the evidence is legally and factually sufficient to support the jury's finding

on breach of duty; (2) whether the evidence is legally and factually sufficient to support the jury's finding on causation; (3) whether the evidence is legally and factually sufficient to support the jury's finding on damages; and (4) whether the trial court erred in admitting certain medical bills. We affirm in part, reverse in part, and remand in part to reform the judgment with respect to damages for past medical expenses.

## FACTUAL SUMMARY

In early February 1997, Corina Rosales detected a lump in her left breast and made an appointment at the Eastside Women's Healthcare Center. On February 21, she was examined by Dr. Linan. Her medical history revealed that she had breast biopsies in 1978 and 1989 that involved benign cysts. Her menstrual period had started on February 5 and she had discovered the lump a little less than a week later. The medical notes and Dr. Linan's testimony indicate that the lump was palpable, round, non-tender, and mobile mass that was about $1 \times 2$ centimeters (cm) in diameter. Dr. Linan's notes illustrate the lump on the upper twelve o'clock position of the left breast. He subsequently noted that there were no skin changes. At trial, he testified that the lump was not visible to the eye and remembered it to be about one centimeter below the skin.

Dr. Linan testified that he told Ms. Rosales that in his opinion, the lump was likely a fibroadenoma or a benign mass. His testimony and medical notes reflect that he told her to return in two weeks for a follow-up. He explained that he did not order any diagnostic tests because at the time of his examination, the lump was not persistent, that is, it had not been present for more than one menstrual cycle. Moreover, Dr. Linan testified that had he ordered any diagnostic testing, he would not have ordered a mammogram since Ms. Rosales' mass was already a dominant mass, but he would have ordered an ultrasound to rule out a fluid-filled cyst. He claimed that the only sure way to know that the lump was not cancerous was to do a biopsy. His medical notes suggest a discussion concerning continuing self-breast exams versus a biopsy and that Ms. Rosales declined the biopsy. Dr. Linan testified that because she was mid-cycle, the decision was made to wait and follow-up once she was past her next period. He also testified that normal procedure following an office visit is for the patient to take her chart and a routing slip to a window at the front office to receive a follow-up appointment.

Corina Rosales testified that she had discovered the lump during a self-breast examination and that she had had sharp pains in her nipple and had told this to Dr. Linan. She recalled that the doctor examined her breast when she was seated and when she was lying down. Dr. Linan told her that the lump felt like a cyst and that it did not feel like anything she should worry about and that he had patients who have had lumps in their breasts for years. He did say that if it bothered her, she could come back and he would have it removed. She said that although he told her to continue self-breast examinations, he did not suggest any other diagnostic procedure and he did not tell her to come back in two weeks.

Ms. Rosales' husband, Martin Flores, testified that he was present in the examination room during Dr. Linan's examination. He told the jury that Dr. Linan told his wife that he felt the lump, but that it did not feel bad, that it could just be a cyst, that most lumps found by women through self-examination are cysts, and

that he had a lot of patients walking around with such lumps. He testified that he was surprised by the quickness of the examination and that nothing was said about another appointment or about removing the lump, although he did recall Dr. Linan saying something about "draining it." They were not given any paperwork when they left the examination room.

Ms. Rosales testified that by April 1997, the lump seemed to have grown and moved closer to her armpit, but she did not notice any change in the skin over the lump. She made an appointment for April 23 with Dr. Luz Candelaria, by whom she had previously been treated for headaches and tension.

Dr. Candelaria testified that he examined Ms. Rosales on April 23, and that he could immediately see an overt mass in the one o'clock position on her left breast. He felt a hard mass and observed an orange peel effect on the skin where the lump protruded against the skin. He recorded on his examination notes that Ms. Rosales reported the onset of the lump two months earlier and that she had seen another doctor before seeing Dr. Candelaria. Ms. Rosales told him that the doctor had said that she should not worry because he thought that it was just a menstrual estrogen-effect-cycle-induced mass. Dr. Candelaria immediately ordered a mammogram which was scheduled for the following day, April 24.

The first mammogram suggested only that there was a 4 × 3 cm mass in the upper outer quadrant of Ms. Rosales left breast. The radiologist reported that her breasts were very dense and recommended a "coned down compression view" mammogram and an ultrasound for further evaluation. Both recommended tests were subsequently performed in succes-

sion, but it is not clear over what time frame they were performed.

The "coned down compression view" again showed an inconclusive 4 × 3 cm mass that was "amenable for ultrasound guided biopsy." The radiologist's recommendation was for an ultrasound to further evaluate the mass, and he suggested that an ultrasound-guided biopsy for histological evaluation was appropriate. An ultrasound was subsequently performed and the radiologist's evaluation reported a breast mass that conformed with the mammograms, that was approximately 2 × 1.9 cm in size with irregular margins, and was suspicious for malignancy. The report also revealed a 12.8 × .5 millimeter (mm) cyst at the ten o'clock position and a 6.9 × .6 mm hypoechoic mass at the four o'clock position. The ultrasound-guided biopsy was not ordered or performed.

On May 2, 1997, Dr. Candelaria performed what he variously referred to in his testimony and medical notes as a biopsy, excision of breast mass, or lumpectomy. His testimony and surgical and pathology notes reflect that he made an elliptical incision around the mass and excised a 5 × 3.5 × 3 centimeter section of skin and underlying breast tissue. In his post-operative notes, Dr. Candelaria described the mass as "hard, circumscribed, measuring approximately 2 cm × 2½ cm."

The pathology examination was performed on May 6. The entire specimen was inked to mark the margin of resection. The sectioned specimen revealed that the closest margin of resection to the tumor mass was 2 mm. The tumor was diagnosed as a moderately differentiated grade II to poorly differentiated grade III invasive ductal carcinoma that measured 1.8 × 1.5 × 1.5 cm. Microscopic examination revealed a positive margin; cancer cells extended out to the edge of the inked

tissue.[1]

Ms. Rosales was informed by Dr. Candelaria on May 7 of the positive margin pathology report and according to his notes he suggested and she agreed to have a modified radical mastectomy. At trial, he testified that he simply informed her of the options of a re-excision or a modified radical mastectomy and that Ms. Rosales wanted the whole breast removed. This surgery was performed the next day.

Corina Rosales ultimately brought suit against Dr. Linan and his employer, Eastside Women's Healthcare Center, for medical malpractice. She contends Dr. Linan breached his standard of care by minimizing her condition and failing to order appropriate diagnostic tests causing a two-month delay in diagnosis. She argues that this negligence proximately caused her condition to worsen and resulted in complete removal of her breast, and other consequential damages.

Dr. Linan and Ms. Rosales were found equally negligent by the jury. Ms. Rosales was found to have sustained damages in the amount of $261,400. The court ordered defendants to pay $160,107.48, with post-judgment interest of 10 percent and all court costs.

### Standard of Review of Legal and Factual Sufficiency

Appellants' first three issues relate to the sufficiency of evidence to support the jury's findings of breach, causation, and the award of damages. The standard of review for each of these issues is the same.

On appellate review of a legal insufficiency point, we consider only the evidence and inferences that, when viewed in their most favorable light, tend to support the finding. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997). We disregard all evidence and inferences to the contrary. *Id.* If there is any evidence of probative force to support the finding, it is upheld. *Sherman v. First Nat'l Bank in Center, Texas,* 760 S.W.2d 240, 242 (Tex.1988). Accordingly, if there is more than a scintilla of evidence, the jury's finding will not be overturned. *Id.* at 242.

In reviewing factual sufficiency, we consider and weigh all of the evidence. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). A verdict is only set aside if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). A reviewing court's opinion may not be substituted for that of the trier of fact. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998).

### Medical Malpractice

■ A plaintiff must prove four elements in a medical malpractice cause of action in order to prevail: (1) a duty by the physician to act according to a certain standard; (2) a breach of the applicable standard of care; (3) injury or harm to the plaintiff; and (4) a causal connection between the breach of the applicable standard of care and the injury or harm. *Krishnan v. Ramirez,* 42 S.W.3d 205, 212 (Tex.App.-Corpus Christi 2001, pet. denied).

■ In a suit for medical malpractice, expert testimony is required to prove negligence unless the form or mode of treat-

---

1. We note that the original pathology report erroneously reported in the "Diagnosis" section of the report that the size of the tumor was 5 × 3.5 × 3 centimeters, (which is the size of the complete excised specimen) when, in fact, the tumor was only 1.8 × 1.5 × 1.5 centimeters in size.

ment is a matter of common knowledge, or the matter is within the experience of a layperson. *See Hood v. Phillips,* 554 S.W.2d 160, 165–66 (Tex.1977); *Arlington Memorial Hospital Foundation, Inc. v. Baird,* 991 S.W.2d 918, 921–22 (Tex.App–Fort Worth 1999, pet. denied). In particular, expert testimony is necessary on the issues of medical negligence and causation. *Arlington Memorial Hospital Foundation, Inc.,* 991 S.W.2d at 922.

### Breach of Standard of Care

In Issue One, Appellants contend Ms. Rosales failed to prove by legally sufficient expert testimony that Dr. Linan breached the standard of medical care. In the alternative, they argue that the evidence supporting the jury's finding of breach is so weak that the finding is clearly wrong and manifestly unjust.

■ The breach of the standard of care allegations had a two-fold premise. The first is that Dr. Linan failed to timely diagnosis breast cancer by failing to order any diagnostic testing at the time of his examination on February 23, 1997. The other is that he failed to instruct Ms. Rosales to return in two weeks for a follow-up evaluation giving the cancerous breast tumor two months to grow.

There is no dispute as to Ms. Rosales' medical condition and history when Dr. Linan examined her on February 23, 1997. She was thirty-eight years old, premenopausal, with small, dense breasts. In 1978 and 1979, she had breast biopsies that removed benign masses. Her menstrual period had begun on February 5 and she had discovered the lump in her left breast about a week later. She was examined by Dr. Linan two weeks after she discovered the lump. The lump was in the upper, outer area of her breast above the nipple. There were no noticeable changes or effects in the skin overlaying the lump. The lump was palpable and had a well-defined round shape; it was about 1.5 centimeters in size, not tender, and mobile.

About two and a half months later, the lump would prove to be cancerous and the pathology of the tumor is not disputed. It was an Invasive Ductal Carcinoma (IDC), an early form of breast cancer, graded as a Stage I or T1 tumor. It was less than 2 centimeters (cm) in size. The cancerous cells had penetrated the duct or lobule wall and invaded the surrounding breast tissue and there was local lymphatic involvement, but there was no evidence that it had spread beyond the breast or that there was cancerous involvement of the axial lymph nodes. It was a fast growing, but highly treatable form of breast cancer.

Ms. Rosales testified and the essence of her testimony is that Dr. Linan told her not to worry because the lump was probably a benign cyst, but she could have it removed if she wanted; that he did not offer or suggest any further diagnostic testing; and he never told her to come back in two weeks for a follow-up examination. Her husband, who was present during Dr. Linan's examination, essentially agreed with Ms. Rosales' testimony.

The only explicit evidence from an expert witness that supports the allegation of negligence by Dr. Linan comes from Dr. Candelaria. Dr. Candelaria testified that it was a breach of the standard of care for Dr. Linan to have not immediately ordered a mammogram. His testimony was unequivocal; whether it was reliable is another matter. He testified quite assuredly that the mammogram was "one of the newest techniques in radiology that is used to detect abnormal tissue," and that a mammogram could distinguish between cystic masses and hard masses. He disagreed with Dr. Linan's purported offer to order a biopsy, stating that a biopsy could be

avoided by doing a mammogram or ultrasound exam first. He also testified that it would be a breach of the standard of care to order a biopsy without knowing what the mass was.

Dr. Joel Abramowitz, a physician board certified in hemotalogy, onocology, and internal medicine also testified on behalf of Ms. Rosales. According to Dr. Abramowitz, the diagnostic tools available to determine the malignancy or prognosis included the mammogram and ultrasound, but that ultimately, the only way to know for sure whether a mass is benign or malignant is to do a biopsy. He concluded that clinical evaluations made by Dr. Linan and Dr. Candelaria show that the tumor had grown in the two months between their respective examinations. He also noted that the pathology reports showed that the tumor was high S–Phase, meaning that the tumor was a quick growing cancer. He testified that if Ms. Rosales had the lumpectomy in February 1997, the tumor would have been smaller than it was in May 1997 and that, in general, a delay in diagnosing a malignant tumor increases the risk of the cancer spreading. He did concede that the delay between February 21 and April 23 did not materially change the ultimate prognosis. He also testified that she could have had the lumpectomy with breast conservation excision and radiation in May 1997, and that most surgeons, if the patient wanted breast conservation, would do a lumpectomy with breast conservation if the tumor was less than 3 cm. He stated that it was possible for cancer to metastasize in two months, but he also admitted that it was "very hard to know scientifically how much a delay is causing a problem or led to a proximate cause." It appears then, with respect to the element of breach of standard of care, Dr. Abramovitz's testimony only vaguely, and only implicitly faults Dr. Linan for the more than two month delay.

Dr. Ann Leitch, a surgical oncologist, testified that Ms. Rosales was a good candidate for breast conserving surgery because the tumor was relatively small. She discounted Dr. Candelaria's clinical observations of orange peel skin and testified that if there had been an orange peel effect on the skin, then the cancer should have been classified as a stage IIIB cancer and it was not the standard of care to do a lumpectomy with that cancer stage. She also testified that it was not reasonable that the passage of time caused Ms. Rosales to have a mastectomy. She explained that a tumor has to be greater than 1 cm to be detected by touch and since it was found to be only 1.8 cm, the tumor had clearly not grown dramatically.

Dr. Raul Portillo, an oncologist, testified that the surgical procedure on May 2, 1997 was a diagnostic biopsy and that Ms. Rosales would have had a second procedure to do either a lumpectomy with axillary dissection of lymph nodes or a mastectomy.

While we have serious doubt as to the reliability of Dr. Candelaria's testimony, which appears to be largely self-serving and dated, whether or not Dr. Linan breached the standard of care by failing to immediately order a mammogram need not be answered. Dr. Linan's medical notes indicate that his orders were for Ms. Rosales to return for a follow-up examination in two weeks, at which time, he could determine whether the lump was persistent and order appropriate diagnostic tests; however, it is clear from the record that these orders were not carried out and Ms. Rosales was never given a follow-up appointment. Accordingly, while Ms. Rosales' first premise for breach of standard of care is dubious, we do agree that the evidence is legally and factually sufficient to find the second premise of her negli-

gence allegation. We overrule the first issue.

■ In their second issue, Appellants challenge the legal and factual sufficiency of the evidence to establish the causal connection between the breach of the standard of care and the injury or harm suffered by Ms. Rosales. Ms. Rosales had to establish a causal connection between her injury and the negligence of Dr. Linan based upon "reasonable medical probability," not mere conjecture, speculation, or possibility. *See, e.g., Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex. 1995); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 500 (Tex.1995); *Kramer v. Lewisville Mem. Hosp.,* 858 S.W.2d 397, 400 (Tex.1993); *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988). This means that the ultimate standard of proof on the causation issue "is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Park Place Hosp.,* 909 S.W.2d at 511, *citing Kramer,* 858 S.W.2d at 400. As both parties have framed the causation issue in this case, the issue is would there have been a better outcome had the diagnosis of Ms. Rosales' breast cancer been accomplished two months earlier, and if so, would that better outcome have been a breast sparing lumpectomy rather than a modified radical mastectomy.

■ We have spent much time and careful analysis of the testimony and the voluminous medical records to assure ourselves that the jury returned a verdict that was sufficiently true in accordance with the evidence. Indeed, all the evidence and arguments about how fast or how slow the tumor grew, or whether Dr. Candelaria's surgical adroitness was an intervening factor in causation only served to cloud our examination, and ultimately, we conclude that such evidence is irrelevant.

Dr. Linan testified and his notes reflect that on February 21, 1997, he observed no skin changes when he examined Ms. Rosales. Then about two months later, in May 1997, Dr. Candelaria testified, and as he recorded in his surgical notes, there was "very obvious prominent mass to the left breast with the skin having an *orange peel appearance.*" [Emphasis added]. "Peau d'orange," as Dr. Abramowitz explained, (the appearance of an orange peel) is a clinical description where cancer cells have invaded the lymphatic vessels causing swelling or edema of the skin overlying the tumor. Then Dr. Leitch, though she disbelieved Dr. Candelaria's diagnosis, nevertheless testified that such a breast cancer is classified as an overall Stage IIIB cancer, regardless of the tumor size. Critically, she testified that breast conserving surgery is not appropriate and is not the standard of care for Stage IIB cancer. She concluded that a mastectomy is generally the standard of care for such breast cancer.

Dr. Raul Portillo, a board certified oncologist, testified that under current surgical protocols, the procedure that Dr. Candelaria employed would be classified as a diagnostic biopsy and not breast conserving therapy. A proper breast sparing lumpectomy would be the removal of the tumor with clear margins plus an axillary dissection or removal of the lymph nodes, followed by a regime of radiation.

So while Dr. Candelaria may have thought that he was following breast conserving therapy surgical protocols, and while there is abundant evidence in the record that Ms. Rosales probably could have had breast conserving surgery, there is still legal and factual evidence that in the two months between when Ms. Rosales should have had a follow-up examination

with Dr. Linan, and when she was finally seen by Dr. Candelaria, the cancer had involved the lymph vessels causing an edema on the skin. At that point, there was no better outcome—a mastectomy was the standard of care, but two months earlier, when there was no evidence of involvement of the lymphatic vessels by the cancer, breast conserving therapy could have been the outcome. Issue Two is overruled.

In Issue Three, Appellants argue that there is legally or factually insufficient evidence to support the jury's finding on damages. The first contention is that there was no segregation of damages, specifically the medical bills, caused by Dr. Linan's negligence from those medical costs that would have accrued irrespective of the negligence. The evidence is clear that when Ms. Rosales first saw Dr. Linan, she had a cancerous tumor. It is clear that if it had been diagnosed soon thereafter that breast conserving therapy, a lumpectomy, axillary dissection of the lymph nodes, chemotherapy, and radiation, would more than likely have been successful. So even if Ms. Rosales had gotten a timely diagnosis of breast cancer and had breast conserving therapy, she still would have had to undergo many of the medical procedures that she ultimately undertook. She would have had radiology treatments at a cost of $23,297; she would have had chemotherapy at a cost of $23, 997; she still would have had the diagnostic and pathology tests at a cost of $604; she would have had about $4,000 in hospital costs at Southwestern General; and she would still have had most of the fees that Dr. Candelaria alleged.

A plaintiff may recover only for reasonable and necessary medical expenses specifically shown to result from treatment made necessary by the negligent acts or omissions of the defendant, where such a differentiation is possible. *See Texarkana Memorial Hosp., Inc. v. Murdock,* 946 S.W.2d 836, 840 (Tex.1997). Consequently, we sustain the first portion of Issue Three; however, because Ms. Rosales has made an offer to remit, we will not reverse and remand for a new trial but will instead affirm and reverse and remand to reform the judgment to exclude the medical costs not caused by any of the alleged negligence, and find that Ms. Rosales is entitled to $8,283 in past medical costs, and that the damages should be reduced by $51,898.

Appellants' second contention regarding the legal and factual insufficiency of the evidence to support the jury's findings of damages concerns Ms. Rosales' damages for Physical Pain and Mental Anguish, Loss of Past Earnings Capacity, Disfigurement in the Past and in the Future, and Medical Care in the Future. There was ample evidence from Ms. Rosales and several others that she had suffered physical pain and mental anguish; there was at least some evidence that she was unable to work and of lost earnings capacity; the loss of her breast is without a doubt evidence of disfigurement; and finally, it is self-evident that she will have medical costs in the future. The jury has broad discretion to assign a specific dollar amount to compensate a person for these kinds of damages. We find that the evidence supporting these elements is legally and factually sufficient to support the jury's finding of damages and overrule Issue Three in this regard.

In the fourth and final issue, Appellants complain generally that the trial court erred in admitting medical records for treatments not caused by Dr. Linan's negligence. We first note that whether to admit or exclude evidence is a matter committed to the trial court's sound discretion. *Interstate Northborough Partnership v.*

*State,* 66 S.W.3d 213, 220 (Tex.2001). The foundation for this issue rests upon the Appellants' basic premise of no showing of causation. Because we have already addressed this foundation above, it is not necessary to address it again. We overrule Issue Four.

The trial court's judgment is reversed in part with respect to the amount of damages awarded to Ms. Rosales for past medical expenses and remanded to reformed to exclude medical costs not caused by Appellants' negligence, and affirm the remainder of the judgment.