Opinion issued May 3, 2007 










 




 




In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00782-CV

__________


HARRIS COUNTY HOSPITAL DISTRICT, Appellant


V.


AUTREY GARRETT, INDIVIDUALLY AND AS NEXT FRIEND OF J.G.,
D.G., AND S.G., MINOR CHILDREN, Appellees






Appeal from the 152nd District Court of

Harris County, Texas

Trial Court Cause No. 2006-08198






O P I N I O N

 In this interlocutory appeal, (1) appellant, Harris County Hospital District
("HCHD"), challenges the trial court's order denying its motion to dismiss the health
care liability claim (2) of appellees, Autrey Garrett, individually and as next of friend
of J.G., D.G., and S.G., her minor children.

 We affirm the trial court's order.

Factual and Procedural Background


 In their original petition, the Garretts allege that HCHD and others (3) were
negligent in failing to notify her of her diagnosis of ductal carcinoma of the breast
until July 2005, even though pathology findings establishing this diagnosis were
made on December 1, 2003, resulting in a significant delay of Garrett's treatment and
the advancement of her cancer. 

 In October 2003, Garrett sought obstetrics and gynecology care at Lyndon B.
Johnson Hospital ("LBJ"), and Dr. John Riggs "assumed care of [Garrett]." Riggs
"discovered a breast mass" in Garrett's left breast and ordered a breast ultrasound,
which was performed on October 6, 2003 and revealed that the mass was "possibly
suspicious for malignancy." Garrett followed up on the results with the Breast Clinic
at LBJ, which scheduled a biopsy. The biopsy was performed on November 25,
2003, and Garrett was "given a follow up appointment with the Breast Clinic for
December 10, 2003 to discuss the results." Although a "pathology report was ready"
on December 1, 2003, Garrett was not informed of the results of the biopsy until July
2005.

 Garrett "transferred her care to Dr. Enrique Ortega," and, during her first visit
with him on November 13, 2003, Ortega also "noted a left breast mass." At a January
15, 2004 appointment, Dr. Ortega told Garrett that he "would obtain her biopsy report
from LBJ" because Garrett had informed him that LBJ "was charging $90 for same." 
Although Ortega delivered Garrett's baby on April 23, 2004, and Garrett returned to
Ortega for two more appointments, he never informed Garrett of the biopsy results. 
 In July 2005, Garrett went to the LBJ emergency room complaining of
"worsening pain" in her left breast, and she was told, for the first time, of her
diagnosis of ductal carcinoma "from the initial November 25, 2003 needle biopsy." 
During this visit, the LBJ oncology clinic evaluated Garrett and informed her that she
had "metastic breast cancer which had spread to her lumbar spine and lymph nodes
in her chest." 

 The Garretts allege that the defendants were negligent in failing to (1) "timely
inform [Garrett] of her cancer"; (2) "procure the results of the November 25, 2003
biopsy"; and (3) "follow appropriate American College of Radiology ('ACR')
guidelines." Garrett contends that as a result of defendants' negligence, her "cancer
spread beyond the confines of her breast," rendering her "treatment options and the
effectiveness of treatment . . . much more limited" and "resulting in injuries from an
acceleration and metastatis of her cancer, a significantly reduced life expectancy, lost
effective medical treatment and therapy, and medical and surgical treatment that was
unnecessary." The Garretts seek damages for physical pain, impairment, mental
anguish, disfigurement, medical expenses, lost earnings, and loss of consortium. 

 The Garretts timely served HCHD with an expert report (4) by Dr. Robert
McWilliams, M.D. In his report, McWilliams details his qualifications as follows:

 I am a board-certified OBGYN and a Fellow of the American
College of Obstetricians and Gynecologists. I am also board eligible in
Reproductive Endocrinology. I have practiced obstetrics and
gynecology as a private practitioner in Denver, Colorado from July 1979
through June, 1998, following my residency at Los Angeles
County/USC Medical Center. I completed a 2-year fellowship in
Reproductive Endocrinology at Baylor College of Medicine in Houston
in June 1990. I was an assistant professor in the Department of
Obstetrics and Gynecology, Division of Reproductive Endocrinology at
the University of Texas Medical School at Houston from 1990 through
1992. I was Head of the Division of Reproductive Endocrinology,
Department of Obstetrics and Gynecology at MacGregor Medical
Association in Houston from January, 1993 until October, 1999. I
reentered private practice in 2000, and am currently a solo practitioner
in Gynecology and Reproductive Endocrinology in Houston, Texas.


 In preparing his report, Dr. McWilliams reviewed the pertinent office and
clinical notes and lab and radiology reports of Dr. Ortega, Dr. Riggs, and LBJ. These
records reveal that Garrett began receiving obstetrical care at LBJ in September 2003
and "underwent her first obstetrical exam with L. Hunt, WNPC on October 3, 2003." 
Hunt, a nurse practitioner, recorded a nodule on Garrett's left breast and made notes
"reflecting appropriate assessment and plans for referral." Furthermore, "the
attending physician," Riggs, "also made a note . . . reflecting knowledge of the breast
exam and nodule."

 These records reveal that Garrett had an ultrasound performed at LBJ on
October 6, 2003, and, as a result, LBJ's "radiology staff" recommended a biopsy. Dr.
Riggs was notified of the findings of the ultrasound on October 10, 2003, and, on that
same date, a "referral note [was] made for [Garrett] to go to the breast clinic." Garrett
attended her second prenatal visit at the "LBJ obstetrical clinic" on October 31, 2003,
and Hunt again examined her. Hunt's notes reflect that Hunt "continued
surveillance" of Garrett's breast nodule and that Garrett had a biopsy appointment in
November 2003. Garrett attended her third prenatal visit at the "LBJ obstetrical
clinic" on November 26, 2003, and Hunt again examined her. Notes from this exam
indicate that Garrett's biopsy was performed on November 25, 2003 and that a
follow-up appointment was scheduled for December 10, 2003.

 The records of the LBJ radiology department also show that Garrett's biopsy
was performed on November 25, 2003 and that samples "were obtained and sent to
pathology for review." The LBJ pathology department's report indicates a "final
pathologic diagnosis" of ductal carcinoma. (5)

 Dr. Ortega's notes and Garrett's medical records show that Garrett transferred
her care to Ortega in late 2003 and that Ortega provided Garrett obstetrical care until
April 20, 2004. On November 13, 2003, during Ortega's initial physical of Garrett,
he noted her abnormal breast mass. Furthermore, an "authorization for release of
information" was completed, authorizing LBJ to release Garrett's records to Ortega. 
Although Ortega's notes from Garrett's December 18, 2003 visit show that the results
of Garrett's biopsy were "to be given on 12/23/03," on January 15, 2004, Ortega
noted that he was "[u]nable to obtain Bx. Results (LBJ.), last mo., (Hospital
Reportedly charging pt. $90.00 to give her results!?). Report requested." Thus, as
Dr. McWilliams notes in his report, there is some evidence that, despite their requests,
Ortega and Garrett were not able to obtain the biopsy results from LBJ. 

 Dr. McWilliams further states in his report that Garrett visited the LBJ
emergency room on July 11, 2005 "with a 6 month history of left breast pain and
swelling." LBJ's notes reveal that a breast ultrasound and a surgical consult with the
oncology clinic was ordered, and a specific note from the emergency room to the
oncology service stated "no follow up on this ever, please evaluate." McWilliams
reviewed Garrett's subsequent medical records, which confirmed the existence of
"advanced disease . . . with metastasis." Garrett initiated treatment soon after she
learned of her diagnosis.

 Based upon the above facts, Dr. McWilliams opines in his report that "the
medical care provided by LBJ Hospital and the physicians providing care to Garrett
fell below the standard of care." McWilliams further opines that "[n]umerous
physicians and support staff personnel at LBJ Hospital were involved in Ms. Garrett's
diagnosis and confirmation by breast biopsy of breast cancer[,] [y]et notification of
this unfortunate diagnosis to Ms. Garrett soon after the diagnosis" was never made
"via phone call or certified letter." In response to any potential defenses to be raised
by LBJ and its staff, McWilliams concludes that "[t]he fact that Ms. Garrett
transferred her care to an obstetrician outside the LBJ hospital system [did] not
absolve them from notifying Ms. Garrett of her breast cancer diagnosis." Also,
accepting the truth of Dr. Ortega's notes regarding his inability to obtain the biopsy's
results from LBJ and LBJ's attempt to charge Garrett $90 before releasing her results,
"the medical records department of LBJ Hospital was also liable in contributing to
the failure to notify Ms. Garrett of her diagnosis of cancer before it continued to
advance to a stage of poorer prognosis." With regard to the LBJ Hospital system,
McWilliams stated,

 Where the greatest degree of medical liability within the LBJ
hospital system lies with respect to notification of this diagnosis to Ms.
Garrett is difficult to say. From


(1) Dr. Riggs, her obstetrician who first made the diagnosis of a left
breast mass to[;]


(2) L. Hunt, her nurse practitioner who initially examined Ms.
Garrett's left breast mass and continued her surveillance of the
mass and recommended Ms. Garrett keep her appointments with
the radiology department for a diagnosis of this mass to[;]


(3) the radiology staff or physicians who performed the needle biopsy
of the breast mass to[;]


(4) the pathology department where the tissue diagnosis was initially
made to[;]


(5) the medical records department who may or may not have refused
to give Ms. Garrett her medical records,


a combination of factors more than likely contributed to the failure to
notify Ms. Garrett of her breast cancer diagnosis. 

. . . .

Without a diagnosis of breast cancer then, no effective diagnostic
measure and therapeutic options were considered or offered Ms. Garrett. 
The inevitable consequence of Ms. Garrett's breast cancer and its
advancement to a poor prognosis with metastasis over an approximate
20 month delay could most likely have been prevented with
confirmation of the disease at the time of her biopsy. 


 HCHD filed objections to Dr. McWilliams's report and a motion to dismiss,
which the trial court denied. 

Standard of Review

 We review a trial court's decision on a motion to dismiss under section 74.351
for an abuse of discretion. See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,
46 S.W.3d 873, 875 (Tex. 2001) (predecessor statute); Gray v. CHCA Bayshore L.P.,
189 S.W.3d 855, 858 (Tex. App.-- Houston [1st Dist.] 2006, no pet.). A trial court
abuses its discretion if it acts in an arbitrary or unreasonable manner without
reference to guiding rules or principles. See Garcia v. Martinez, 988 S.W.2d 219,
222 (Tex. 1999). When reviewing matters committed to the trial court's discretion,
we may not substitute our own judgment for that of the trial court. Bowie Mem'l
Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its
discretion merely because it decides a discretionary matter differently than an
appellate court would in a similar circumstance. Gray, 189 S.W.3d at 858. 

 Expert Report 

 In its sole issue, HCHD argues that the trial court abused its discretion in
denying its motion to dismiss because Dr. McWilliams's expert report (1) "included
no curriculum vitae and nowhere in the body of the report did it show the author was
a competent expert as to [HCHD]"; (2) "failed to identify the standard of care
applicable to [HCHD]"; and (3) "failed to show that any conduct of [HCHD] caused
any damages." 

 A plaintiff bringing a healthcare liability claim must provide each defendant
health care provider with an expert report or voluntarily nonsuit the action. See Tex.
Civ. Prac. & Rem. Code Ann. § 74.351 (Vernon Supp. 2006); Gray, 189 S.W.3d at
858. The expert report is defined as a fair summary of the expert's opinions as of the
date of the report regarding the applicable standards of care, the manner in which the
care rendered by the health care provider failed to meet the standards, and the causal
relationship between that failure and the injury, harm, or damages claimed. See Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (Vernon Supp. 2006). If a plaintiff
timely files an expert report, a defendant may then file an objection challenging the
sufficiency of the report. Id. § 74.351(a). The trial court shall grant a motion to
dismiss only if it appears to the court, after hearing, that the report does not represent
an objective good-faith effort to comply with the definition of an expert report. Id.
§ 74.351(l). 

 The only information relevant to the inquiry is within the four corners of the
document. Palacios, 46 S.W.3d at 878. Although the report need not marshal all the
plaintiff's proof, it must include the expert's opinion on each of the elements
identified in the statute. See Palacios, 46 S.W.3d at 878-79; Gray, 189 S.W.3d at
859. In setting out the expert's opinions, the report must provide enough information
to fulfill two purposes if it is to constitute a good-faith effort. Palacios, 46 S.W.3d
at 879. First, the report must inform the defendant of the specific conduct the
plaintiff has called into question. Id. Second, the report must provide a basis for the
trial court to conclude that the claims have merit. Id. A report that merely states the
expert's conclusions does not fulfill these two purposes. Id. Rather, the expert must
explain the basis of his statements to link his conclusions to the facts. Bowie, 79
S.W.3d at 52. However, a plaintiff need not present evidence in the report as if she
were actually litigating the merits. Palacios, 46 S.W.3d at 879. Furthermore, the
report can be informal in that the information in the report does not have to meet the
same requirements as the evidence offered in a summary judgment proceeding or at
trial. Id. 

Curriculum Vitae and Qualifications

 HCHD first contends that it was not permissible for Dr. McWilliams to set
forth his curriculum vitae in a paragraph contained in his expert report. Alternatively,
HCHD contends that the curriculum vitae is "grossly inadequate" because it fails to
establish Dr. McWilliams's credentials as an expert "on the operation of a major
metropolitan hospital's records systems or pathology labs."

 In regard to the Garretts' service of Dr. McWilliams's curriculum vitae, HCHD
has failed to cite any authority for the proposition that a curriculum vitae must be
furnished as a separate document. (6) Section 74.351(a) provides merely that a claimant
shall serve "one or more expert reports, with a curriculum vitae of each expert." Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(a) (Vernon Supp. 2006) (emphasis added). 
Section 74.402, which addresses the qualifications of an expert in a suit against a
health care provider, also does not include a requirement that a curriculum vitae be
served as a separate document. Id. § 74.402 (Vernon 2005). 

 In regard to Dr. McWilliams's qualifications, section 74.351 defines "expert,"
with respect to a person giving opinion testimony regarding whether a health care
provider departed from accepted standards of health care, to mean "an expert
qualified to testify under the requirements of Section 74.402." Id. § 74.351. Under
section 74.402, a person may qualify as an expert witness on the issue of whether the
health care provider departed from accepted standards of care only if the person,

(1) is practicing health care in a field of practice that involves the
same type of care or treatment as that delivered by the defendant
health care provider, if the defendant health care provider is an
individual, at the time the testimony is given or was practicing
that type of health care at the time the claim arose;


(2) has knowledge of accepted standards of care for health care
providers for the diagnosis, care, or treatment of the illness,
injury, or condition involved in the claim; and


(3) is qualified on the basis of training or experience to offer an
expert opinion regarding those accepted standards of health care.

Id. § 74.402(b) (Vernon 2005).

 "Practicing health care" is defined as including (1) training health care
providers in the same field as the defendant health care provider at an accredited
educational institution or (2) serving as a consulting health care provider and being
licensed, certified, or registered in the same field as the defendant health care
provider. Id. § 74.402(a)(1), (2). To determine whether an expert "is qualified on the
basis of training or experience" under subsection (b)(3), a court is to consider whether
the expert (1) is certified by a licensing agency of one or more states of the United
States or a national professional certifying agency, or has other substantial training
or experience, in the area of health care relevant to the claim and (2) is actively
practicing health care in rendering health care services relevant to the claim. Id.
§ 74.402(c)(1), (2) (Vernon 2005).

 As stated in his expert report, Dr. McWilliams is "a board-certified OBGYN
and a Fellow of the American College of Obstetricians and Gynecologists" and is also
"board eligible in Reproductive Endocrinology." Following his residency,
McWilliams practiced obstetrics and gynecology from July 1979 through June 1988. 
Then, after completing a two-year fellowship in Reproductive Endocrinology at
Baylor College of Medicine, he served as an assistant professor at the University of
Texas Medical School in the Department of Obstetrics and Gynecology for two years. 
McWilliams subsequently served as the head of the reproductive endocrinology
division for the department of obstetrics and gynecology at a medical association for
approximately seven years. Finally, he reentered private practice in 2000, and
currently practices as a solo practitioner in gynecology and reproductive
endocrinology in Houston. 

 We note that the specific nature of the Garretts' claims is that HCHD
employees and staff failed to inform Garrett of her diagnosis and failed to release her
medical records to both her and her doctor. The pertinent standard of care identified
in Dr. McWilliams's report is that HCHD employees and staff should have timely
informed Garrett of her cancer diagnosis and should have released her medical
records, including her biopsy results, to both her and her doctor upon their respective
requests. In regard to the nature of the Garretts' claims and the pertinent standard of
care, HCHD has provided us with no authority that would require McWilliams to
possess expertise "on the operation of a major metropolitan hospital's records systems
or pathology labs." 

 We conclude that Dr. McWilliams is qualified to serve as an expert on the issue
of whether HCHD departed from the accepted standards of care in regard to the
Garretts' claims. McWilliams established his expertise in the fields of obstetrics and
gynecology and satisfied the statutory requirements by showing that he is practicing
health care in a field of practice that involves the same type of care or treatment as
that delivered by HCHD; has knowledge of accepted standards of care for health care
providers for the diagnosis, care, or treatment of the illness, injury, or condition
involved in the claim; and is qualified on the basis of training or experience to offer
an expert opinion regarding those accepted standards of health care. Accordingly, we
hold that the trial court did not err in denying HCHD's motion to dismiss the health
care liability claims of the Garretts on the grounds that Dr. McWilliams set forth his
curriculum vitae in his expert report and that he did not establish his credentials as
an expert on the operation of a major metropolitan hospital's records systems or
pathology labs." 

Standard of Care

 HCHD next argues that Dr. McWilliams's report is inadequate because "it fails
to identify the standard of care that was allegedly breached" and "never states what
should have been done." HCHD asserts that McWilliams's statements in his report
that no person notified Garrett of her diagnosis does not establish that the standard
of care required such notification. HCHD also asserts that Garrett was being treated
by multiple health care providers, including nurses and physicians, "who all may or
may not have had access to the information," and that the complaint that all of those
providers failed to inform her of her cancer diagnosis does not show a duty owed by
any one provider. 

 In identifying the standard of care, whether a defendant breached his or her
duty to a patient cannot be determined absent specific information about what the
defendant should have done differently. Palacios, 46 S.W.3d at 880. While a "fair
summary" is something less than a full statement of the applicable standard of care
and how it was breached, even a fair summary must set out what care was expected,
but not given. Id. When a plaintiff sues more than one defendant, the expert report
must set forth the standard of care for each defendant and explain the causal
relationship between each defendant's individual acts and the injury. See Doades v.
Syed, 94 S.W.3d 664, 671-72 (Tex. App.--San Antonio 2002, no pet.); Rittmer v.
Garza, 65 S.W.3d 718, 722-23 (Tex. App.--Houston [14th Dist.] 2001, no pet.).

 The pertinent standard of care identified by Dr. McWilliams is that an HCHD
employee should have informed Garret of her biopsy results and should have released
those results upon Garrett's or Dr. Ortega's request. See Columbia Rio Grande
Regional Healthcare, L.P. v. Hawley, 188 S.W.3d 838, 843-44, 848-51 (Tex.
App.--Corpus Christi 2006, pet. filed) (affirming jury verdict against hospital for its
negligence in failing to timely and properly convey cancer diagnosis to patient for
almost full year); see also Bowie, 79 S.W.3d at 52 (recognizing that report fairly
summarized standard of care because it stated that hospital should have established
procedures to read and interpret x-rays in timely manner and to inform patients about
results). HCHD asserts that no one, other than the pathology department and records
department, are even mentioned in the report in relation to the hospital. However,
although the report primarily focuses on the actions of Garrett's treating physicians,
including Dr. Riggs, the attending physician at LBJ, the report also specifically
references both the conduct of nurse practitioner Hunt and the conduct of LBJ's
medical records department in refusing or failing to release Garrett's biopsy results
when Dr. Ortega and Garrett requested those results. Thus, we conclude, from our
review of the four corners of the report, and in light of the specific nature of the
Garretts' claims, that the report informs HCHD of the specific conduct that the
Garretts have called into question, the standards of care that should have been
followed, and what HCHD should have done. Accordingly, we hold that the trial
court did not err in denying HCHD's motion to dismiss the health care liability claims
of the Garretts on the ground that McWilliams's report fails to identify HCHD's
standard of care and state what HCHD should have done. 

Causation

 Finally, HCHD asserts that Dr. McWilliams's report "never identifies what
caused the alleged damages" and does not show that Garrett "actually sustained" any
damages. HCHD also asserts that the report indicates only that the delay in informing
her of her diagnosis led to a "a poor forecast for the disease," which "is not an actual
damage." Futher, HCHD asserts that the report did not show "that anything different
would have happened." As noted above, an expert report must provide a fair
summary of the expert's opinions regarding the causal relationship between the
failure of the health care provider to provide care in accord with the pertinent
standard of care and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem.
Code Ann. § 74.351(r)(6). Here, Dr. McWilliams states in his report that Hunt, a
nurse practitioner who examined Garrett during her prenatal visits, was assisting in
"continued surveillance" of Garrett's breast nodule, was aware of the biopsy, and
failed to inform Garrett of her diagnosis. McWilliams also states in his report that
the LBJ radiology department performed a biopsy of Garrett's left breast on
November 25, 2003, the biopsy samples were sent to LBJ's pathology department for
review, and a "final pathologic diagnosis" of ductal carcinoma was made on
December 1, 2003, yet Garrett was never notified of this diagnosis by any LBJ
employee. McWilliams opined that nurse Hunt as well as LBJ employees in the
pathology department and LBJ's "radiology staff" had a responsibility to notify
Garrett of this diagnosis. McWilliams also cited in his report a note from LBJ's
emergency room to the oncology service, made after Garrett visited the LBJ
emergency room in July 2005, that stated "no follow up on this ever, please evaluate."
(emphasis added).

 Furthermore, Dr. McWilliams's report indicates that after Garrett transferred
her care to Dr. Ortega, an OBGYN outside of the LBJ system, Ortega and Garrett
sought to obtain the biopsy results from LBJ, but were unable to obtain them. 
McWilliams opined that LBJ staff in the medical records department had a
responsibility to provide Garrett her medical records, including her biopsy results,
and that the failure to provide those results violated HCHD's standard of care. Again,
in response to any potential claim by HCHD that Dr. Ortega, or another treating
physician for which HCHD was not liable, was solely charged with the responsibility
to notify Garrett, McWilliams asserted that HCHD was not absolved of its
responsibility to notify Garrett of her diagnosis because she transferred her care to a
doctor outside the LBJ system. McWilliams also noted in his report, despite HCHD's
apparent failure or refusal to release Garrett's records, that a form authorizing the
release of her medical records to Dr. Ortega had been completed. 

 In regard to whether Garrett sustained any harm as a result of the
approximately one and one-half year delay in learning of her cancer diagnosis, Dr.
McWilliams stated in his report that when Garrett finally visited the LBJ emergency
room, she presented "with a 6 month history of left breast pain and swelling." At this
point, Garrett had developed "advanced disease . . . with metastasis." McWilliams
further stated that because of the delay in communicating the diagnosis, "no effective
diagnostic measure and therapeutic options were considered or offered Ms. Garrett,"
with the "consequence" of the cancer's "advancement to a poor prognosis with
metastasis." McWilliams opined that such advancement with metastasis (7) "could most
likely have been prevented with confirmation of the disease at the time of her biopsy"
and absent the "approximate 20 month delay."

 In support of its causation argument, HCHD relies on Bowie, where the
plaintiff alleged that a hospital's physician's assistant misread or misplaced an x-ray
and, therefore, did not discover that the plaintiff had fractured her foot. Bowie, 79
S.W.3d at 50. Approximately one month later, the plaintiff's orthopedic surgeon
discovered the fractured foot. Id. The plaintiff filed an expert report, which stated
that had the x-ray been properly read, she "would have had the possibility of a better
outcome." Id. at 51. The supreme court, after recognizing that a report need not use
any particular magical words, held that the trial court could have reasonably
determined that the report did not represent a good-faith effort to summarize the
causal relationship. Id. at 53. The court noted that the report simply opined that the
plaintiff had a "possibility of a better outcome," and did not sufficiently "[link] the
expert's conclusion (that [the plaintiff] might have had a better outcome) to [the
hospital's] alleged breach (that it did not correctly read and act upon the x-rays)." Id.

 Here, in contrast, Dr. McWilliams opined in his expert report that HCHD's
breach of its standard of care permitted Garrett's cancer to advance and metastasize. 
See Linan v. Rosales, 155 S.W.3d 298, 305-06 (Tex. App.--El Paso 2004, pet.
denied) (affirming verdict in favor of plaintiff for doctor's failure to timely diagnose
cancer based on evidence that during two-month period cancer "involved the lymph
vessels" and caused edema and that advancement of cancer eliminated option of
breast conserving therapy); In re Barker, 110 S.W.3d 486, 491 (Tex. App.--Amarillo
2003, no pet.) (finding expert report stating that negligent failure to recognize
medical condition and delay in treatment increased severity of plaintiff's injuries to
be sufficient). McWilliams further noted in his report that as a result of the failure
to timely inform Garrett of her cancer, Garrett, in July 2005, presented herself at
LBJ's emergency room with a six month history of pain and swelling in her breast. 
Furthermore, McWilliams opined that the failure to timely inform Garrett of her
diagnosis eliminated the availability of effective diagnostic measures and therapeutic
options.

 We conclude that Dr. McWilliams, in his report, provided a fair summary of
the causal relationship between HCHD's failure to meet the pertinent standard of care
and the Garretts' damages. Accordingly, we hold that the trial court did not err in
denying HCHD's motion to dismiss the health care liability claims of the Garretts'
on the ground that McWilliams's report does not show that HCHD's conduct actually
caused the Garretts' any damages. 

 We overrule HCHD's sole issue. 


Conclusion


 We affirm the order of the trial court.



 Terry Jennings

 Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.



1. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (Vernon Supp. 2006).
2. "'Health care liability claim' means a cause of action against a health care provider
or physician for treatment, lack of treatment, or other claimed departure from accepted
standards of medical care, or health care, or safety or professional or administrative
services directly related to health care, which proximately results in injury to or death
of a claimant, whether the claimant's claim or cause of action sounds in tort or
contract." Id. § 74.001(a)(13) (Vernon 2005). "Health care provider" includes any
person, partnership, professional association, corporation, facility, or institution duly
licensed, certified, registered, or chartered by the State of Texas to provide health
care, including a registered nurse or a health care institution. Id. § 74.001(a)(12)(A). 
"Health care institution" includes a hospital or a hospital system. Id. § 74.001(a)(11).
3. The Garretts sued HCHD doing business as Lyndon B. Johnson Hospital ("LBJ"). 
Thus, references in this opinion to LBJ implicate HCHD. The Garretts also sued
Michelle Lesslie, D.O., Marian Bonner, M.D., Emily Robinson, M.D., Enrique
Ortega, M.D., the University of Texas System, and the University of Texas Health
Science Center at Houston, none of whom are parties to this appeal.
4. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (Vernon Supp. 2006).
5. Dr. McWilliams summarizes the report as follows: "A final pathological diagnosis of
the biopsied left breast nodule to be 'breast with ductal carcinoma, modified Black's
Nuclear Grade: 3 (poorly differentiated), focus suspicious for lymphovascular
invasion identified, and ductal carcinoma in situ: possible foci present, await
immunostains for confirmation.'"
6. Papkov v. Schiffman, No. 01-00-01099-CV, 2002 WL 1041118, at *1 (Tex.
App.--Houston [1st Dist.] May 23, 2002, no pet.) (mem. op.), the case cited by
HCHD in support of its argument, is not on point as the appellant in that case wholly
failed to file a curriculum vitae. Id. Moreover, we note that the Corpus Christi Court
of Appeals has rejected a similar complaint. See Carreras v. Marroquin, No.
13-05-082-CV, 2005 WL 2461744, at *2 (Tex. App.--Corpus Christi Oct. 6, 2005,
pet. filed) (mem. op.) ("The statute does not expressly prohibit a claimant from
including the curriculum vitae within the body of the report, as was done in this
case."). 
7. "Metastasis" means "the development of secondary malignant growths at a distance
from a primary site of cancer." The New Oxford American Dictionary 1074 (1st
ed. 2001).