Opinion Issued June 5, 2008















Opinion Issued June 5, 2008

 

 

 

 

 













 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-07-00459-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



RONALD R. EIKENHORST, M.D. AND TRINITY COMMUNITY
 MEDICAL CENTER,
Appellants

 

V.

 

LEONARD M. WELLBROCK AND MARY WELLBROCK, Appellees

 

 



On Appeal from the 335th District Court

Washington
 County, Texas








Trial Court Cause No. 33639

 

 



MEMORANDUM OPINION

This appeal arises from a medical
malpractice claim brought by Appellees, Leonard and Mary Wellbrock, against
Appellants, Trinity
 Community Medical
 Center
(Trinity) and Ronald Eikenhorst, M.D. 
The trial court denied Appellants’ motions to dismiss which asserted
that the Wellbrocks failed to satisfy the requirements set forth in section
74.351 of the Texas Civil Practice and Remedies Code.  See Tex.
Civ. Prac. & Rem. Code Ann. § 74.351 (Vernon Supp. 2007).  The Wellbrocks move to dismiss the appeal for
want of jurisdiction, alleging that Appellants are appealing an interlocutory
order which denied relief under section 74.351(l).  See id.
§ 74.351(l).  As to the merits, in their sole issues, both
Trinity and Eikenhorst contend that the trial court abused its discretion in
ruling that the Wellbrocks’ expert report complies with the statute.  We conclude that we have jurisdiction over
the appeal and affirm the trial court’s decision.

Background

          On August 27, 2004, an ambulance
transported Leonard Wellbrock to Trinity after he was seriously injured in a
motor vehicle accident.  Leonard arrived
at Trinity immobilized on a backboard and wearing a cervical collar, with head
blocks on either side of his head.  The
emergency physician ordered radiographic studies of Leonard’s spine, which
Trinity performed.  The Wellbrocks allege
that Trinity’s radiology technicians removed Leonard from the backboard, took
off his cervical collar, and placed him upright in a sitting position in order
to take the x-rays.

          Dr. Eikenhorst is the radiologist who interpreted
Leonard’s x-rays.  In his report, he
noted that Leonard had a spinal dislocation injury at the C7-T1
level, but Eikenhorst diagnosed the dislocation as being “consistent with a
history of prior fracture and prior surgery.” 
The Wellbrocks claim that Eikenhorst did not communicate his findings on
the nature or extent of Leonard’s injuries to the emergency department
physician, and as a result, Trinity discharged Wellbrock “without the required
orthopedic or neurological expedited evaluation and treatment.”  

On August
29, after Leonard’s condition had deteriorated, Mary took Leonard to St. Luke’s
Medical Center.  There, the orthopedic surgeon who had
previously operated on Leonard’s spine surgically repaired his cervical spine
fracture.  Leonard now suffers permanent
impairment, which the Wellbrocks attribute to the willful and wanton negligence
by Trinity and Eikenhorst. Specifically, the Wellbrocks allege that Trinity and
Eikenhorst exacerbated Leonard’s injuries when (1) Eikenhorst failed to
diagnose a serious injury to Leonard’s back, causing a delay in his treatment,
and (2) Trinity removed Leonard’s neck collar and backboard during the x-ray
process, instead of keeping him immobilized. 
The Wellbrocks brought suit under both Chapter 74 and the Emergency
Medical Treatment and Active Labor Act (EMTALA).

          In support of their claims, the
Wellbrocks filed the expert report of Dr. John Harris.  The report first classifies Leonard’s injury
as a bilateral interfacetal dislocation (BID) which occurred at the C7-T1
vertebra.  According to Harris, the
dislocation is clearly shown on the imaging studies reviewed by
Eikenhorst.  Harris states that “BID is a
completely unstable injury which requires prompt recognition and appropriate
expedited management to spare or prevent, as much as possible, further injury
to the spinal cord.”  Harris continues by
stating that “any injury to the spine requires immediate attention, especially
when there is pressure on the spinal cord, and the delay in treatment will
unnecessarily aggravate such injuries.”  

          In regard to the standard of care
required by Eikenhorst, the report states that the standard of care required
Eikenhorst to: (1) communicate his report of 
Wellbrock’s cervical spine CT examination directly to the emergency
physician as soon as Dr. Eikenhorst completed his interpretation of the CT
scan; (2) make the correct diagnosis of BID, a relatively common and
radiographically obvious injury; (3) immediately transmit the diagnosis of BID
to the attending physician personally by direct communication; and (4)
document, in his written report, that he has communicated the findings of BID
to the attending physician, so as to ensure that the patient remains
immobilized and receives the proper and immediate orthopedic or neurological
evaluation of the serious spinal injury. 
The report then
outlines the ways by which Eikenhorst deviated from the standard of care
including failing to communicate his findings, failing to recognize BID and
rendering an erroneous diagnosis, and failing to document in his report that he
communicated the C7-T1 findings to the emergency
physician.  

In describing how Eikenhorst’s breach
of the standard of care caused Leonard’s injuries, the report reads in
pertinent part:

    (1) Dr.
Eikenhorst’s egregious, willful and wanton failure to immediately communicate his
finding of the CT scan to the Emergency physician . . . resulted in Mr.
Wellbrock’s being discharged from the Trinity Medical Center, and in turn, led
to further aggravation of Mr. Wellbrock’s cervical spinal cord injury due to
prolonged compression of the cord and unwarranted delay in treatment.

    (2)   . . . It is my opinion that the failure of
Dr. Eikenhorst to render a correct interpretation of Mr. Wellbrock’s serious
BID injury, which necessarily involves serious injury to the spinal cord with
potential paralysis . . . directly led to the improper discharge of Mr.
Wellbrock without the required orthopedic or neurological immediate evaluation
and treatment.  It is my expert opinion
that Dr. Eikenhorst’s failure to properly interpret Mr. Wellbrock’s serious BID
caused the delay in evaluation and treatment that then resulted in his
permanent impairments which, within reasonable medical probability, would not
have resulted if Dr. Eikenhorst had properly diagnosed the serious BID.

    (3)  . . . It is my opinion that due to the
serious nature of Mr. Wellbrock’s injury, the failure of Dr. Eikenhorst to
personally communicate and discuss the imaging studies with the Emergency
Department physician led to Mr. Wellbrock’s discharge without the required
orthopedic or neurological expedited evaluation and treatment, which, in
reasonable medical probability, would have led to greatly recovered health
status by Mr. Wellbrock, instead of his current permanent impairment. . . .
During the time of his discharge from the Trinity
 Medical
 Center
until his admission at St. Luke’s Episcopal Hospital, Mr. Wellbrock’s spinal
cord injury progressed, and became clinically obvious with his deteriorated
health.  

Had Dr. Eikenhorst made the correct diagnosis and
relayed the information to the Emergency physician, it [sic] my expert opinion
and is within reasonable medical probability, that Mr. Wellbrock would have
been emergently transferred to St. Luke’s Episcopal Hospital and treated
appropriately and promptly, with a much better prognosis than he had when
admitted . . .  on 8/29/04, a delay of
two days without the proper stabilization of the spinal column and immediate
attention to the pressure on the spinal cord due to the BID injury.

 

          Dr.
Harris’s report also outlines the standard of care for Trinity and the
Department of Radiology.  According to
Harris, the standard of care for a patient admitted to the hospital emergency
department complaining of severe neck pain and with a cervical collar in place
“requires that the cervical immobilization never be removed until the cervical
spine has been ‘cleared’ (allowing the removal of the immobilizing apparatus)
by the radiologist.”  The report also
states that the standard of care requires that the radiology department
“develop and maintain Policies and Procedures regarding the management of
patients suspected of cervical spine injury” and that the hospital “instruct
and document educational programs for employee management of patients suspected
of having cervical spine injuries (as Mr. Wellbrock) to ensure that all the
Hospital staff handling such injured patients. . . will perform all the
required procedures in the required manner to prevent further cervical spine
injuries.”  

          The report proceeds by outlining how,
in Dr. Harris’s opinion, Trinity deviated from the standard of care.  It states that there is no record that Leonard’s
cervical spine had been cleared, but there is no image of the cervical collar
being in place on any of the CT scans.  The
report concludes that this means that the cervical collar had been removed
before placing Leonard on the CT scan. 
In addition, the erect chest x-ray of Leonard shows that Leonard was
placed in a sitting position for the chest x-ray, without a cervical collar,
which reasonably means the x-ray technician removed the spine immobilization support.  Dr. Harris opines that removing the cervical
collar and placing a patient in a sitting position, when the patient is
suspected of having a spine injury, is a breach of the standard of care.  His report also states that Trinity deviated
from the standard of care by failing to document the time Eikenhorst
interpreted the x-ray so as to ensure the prompt transcription and printing of
the report for the patient’s chart. 

          Dr. Harris’s report concludes by
describing the way in which Trinity’s breach of the standard of care caused
Leonard’s injuries.  It reads in
pertinent part:

          (1) . . . The failure of the radiology department staff to
continuously maintain Mr. Wellbrock’s spine immobilized during the imaging
procedures, within reasonable medical probability, exacerbated and aggravated
his serious BID injury, which ultimately resulted in permanent impairments.

          (2)  . . . [R]emoval
of the cervical collar and placing a patient into an erect (sitting) position,
when the patient is suspected of an acute cervical spine injury . . . in
reasonable medical probability leads to further damage to the already injured
spine.  The fact that further damage and
injury to the spine cord occurred is clearly evident by the major progression
of Mr. Wellbrock’s neurologic findings from the time he was discharged from Trinity Medical Center
until his admission to St. Luke’s Episcopal Hospital.  Therefore, it is my expert opinion that the
further injury and aggravation of Mr. Wellbrock’s BID, within reasonable
medical probability, was caused by the willful and wanton removal of his spinal
immobilization apparatus and movement of the patient without such
immobilization during the studies performed by the Trinity Medical Center
Radiology Department and resulted in his permanent impairments.

          (3) . . . [T]he failure of the Hospital to ensure that this
imaging report was promptly included in Mr. Wellbrock’s chart, to ensure its
review by the Emergency Department physician, caused a delay in the treatment
of Mr. Wellbrock, thereby aggravating his spinal cord injury, which resulted in
permanent impairments to Mr. Wellbrock because of the prolonged compression of
the spinal cord until his treatment at St. Luke’s three days later. 

 

After receiving Harris’s report, both
Trinity and Eikenhorst objected to its sufficiency and moved to dismiss the
Wellbrocks’ suit, contending that the expert report failed to comply with the
requirements of section 74.351.  See Tex. Civ. Prac. & Rem. Code Ann. §74.351.  The trial court denied Trinity’s and
Eikenhorst’s motions to dismiss, and they appealed.




Appellate Jurisdiction

As an initial matter, the Wellbrocks
contest our jurisdiction over the appeal. 
Specifically, the Wellbrocks contend that Trinity and Eikenhorst cannot
appeal under section 74.351(b) because they filed an expert report and that
section applies only when no report has been filed.  See id. § 74.351(b).  Rather, the Wellbrocks contend, Trinity and
Eikenhorst challenge the sufficiency of the expert report which is a challenge
under section 74.351(l) and not
appealable.  Id.  We disagree.

Section 74.351(b) states that if

 “an expert
report has not been served within the period specified by Subsection (a), the
court, on the motion of the affected physician or health care provider, shall,
subject to Subsection (c), enter an order that: (1)  awards to the affected physician or health
care provider reasonable attorney's fees and costs of court incurred by the
physician or health care provider;  and (2)  dismisses the claim with respect to the physician
or health care provider, with prejudice to the refiling of the claim.”

 

Id.  Section 74.351(l) states that “a court shall grant a motion challenging the
adequacy of an expert report only if it appears to the court, after hearing,
that the report does not represent an objective good faith effort to comply
with the definition of an expert report in Subsection (r)(6).”  Id. §
74.351(l).  Section 51.014 allows an interlocutory
appeal from a court order that “denies all or part of the relief sought by a
motion under section 74.351(b), except that an appeal may not be taken from an
order granting an extension under section 74.351” or from an order that “grants
relief sought by a motion under section 74.351(l).”  Id. § 51.014(a)(9) & (10).  

Here, both Trinity and Eikenhorst
moved to dismiss the suit under 74.351(b), as only subpart (b) provides for dismissal
and fees,[1] and the
trial court denied relief.  “As subpart
(c) defines a timely but deficient report as one that ‘has not been served,’
the same meaning must be given the same phrase in subpart (b).”  Lewis
v. Funderburk, No. 06-0518, 2008 WL 1147188, at *5 (Tex. April 11, 2008); see also Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(b) & (c) (Vernon Supp. 2007).  An expert report has
thus not been served for purposes of 74.351(b) if only an inadequate report has
been served.  Lewis, 2008 WL 1147188, at *1. 
Parties are entitled to bring an interlocutory appeal for denial of
relief under 74.351(b).  Tex. Civ. Prac. & Rem. Code Ann. §
51.014(a)(9).  We therefore hold that we
have jurisdiction over this appeal.

Expert Report

In their sole issues, both Eikenhorst
and Trinity contend that the trial court erred in its determination that the
Wellbrocks’ expert report complied with section 74.351 of the Civil Practice
and Remedies Code.  Both Eikenhorst and
Trinity contend that (1) Harris is not qualified to offer any opinions in this
case under section 74.401 or 74.402 respectively; (2) Harris is not qualified
to offer opinions on causation because his specialty is in radiology, not
neurology; and (3) the report is conclusory on causation and does not
distinguish Leonard’s pre-existing condition and injuries.  See id.
§§ 74.401 & 74.402.  In response, the
Wellbrocks assert that Trinity and Eikenhorst waived their obections to the
expert report by failing to timely object as required by section 74.351.  See id.
§ 74.351(a).  Trinity responds that
it preserved its right to request dismissal by timely objecting.

Standard of Review

          We
review section 74.351 rulings under an abuse of discretion standard.  See Am. Transitional Care Ctrs. v. Palacios,
46 S.W.3d 873, 875, 877 (Tex. 2001)  (reviewing ruling under predecessor statute);
Gray v. CHCA Bayshore L.P., 189 S.W.3d 855, 858 (Tex. App.—Houston
[1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in
an arbitrary or unreasonable manner without reference to guiding rules or
principles.  See Garcia v. Martinez, 988
S.W.2d 219, 222 (Tex. 1999). When reviewing
matters committed to the trial court’s discretion, we may not substitute our
own judgment for that of the trial court.  Bowie
Mem’l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002).
A trial court does not abuse its discretion merely because
it decides a discretionary matter differently than an appellate court would in
a similar circumstance.  Gray, 189
S.W.3d at 858.  However, a trial court has no
discretion in determining what the law is or in applying the law to the facts.  See Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992).
 

Section 74.351 of the Texas
Practice and Remedies Code

          Pursuant
to section 74.351, medical malpractice plaintiffs must provide each defendant
physician and health care provider with an expert report.  See Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(a) (Vernon Supp. 2007).  An expert report means a “written report by
an expert that provides a fair summary of the expert’s opinions as of the date
of the report regarding applicable standards of care, the manner in which the
care rendered by the physician or health care provider failed to meet the
standards, and the causal relationship between that failure and the injury,
harm, or damages claimed.”  Id.
§ 74.351(r)(6).  A defendant may file an
objection to the sufficiency of the report not later than the 21st day after
the date it was served.  Id.
§ 74.351(a).  A trial court shall grant a
motion challenging the adequacy of the expert report only if it appears to the
court, after hearing, that the report does not represent an objective good
faith effort to comply with the statutory definition of an expert report.  Id. § 74.351(l).

          Although the
report need not marshal all the plaintiff’s proof, it must include the expert’s
opinions on the three statutory elements—standard of care, breach, and
causation.  See Palacios, 46
S.W.3d at 878–79.  In detailing these
elements, the report must provide enough information to fulfill two purposes if
it is to be considered a good faith effort. 
Id. at 879.  First, the report must inform the defendant
of the specific conduct that the plaintiff has called into question.  Id. at
879.  Second, the report must provide a
basis for the trial court to conclude that the claims have merit.  Id.  A report that merely states the expert’s
conclusions as to the standard of care, breach, and causation does not fulfill
these two purposes.  Id.  The expert must explain the basis for his
statements and must link his conclusions to the facts.  Bowie Mem’l Hosp.,
79 S.W.3d at 52.  Furthermore, in
assessing the report’s sufficiency, the trial court may not draw any
inferences, and must instead rely exclusively on the information contained
within the report’s four corners.  See
Palacios, 46 S.W.3d at 879.  A report
that omits any of the statutory requirements is not a good faith effort to
comply with the Act.  Id.  A trial court must dismiss a cause if it
determines that the report does not represent a good faith effort to comply
with the statute’s requirements.  Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l); see
Jernigan v. Langley,
111 S.W.3d 153, 156 (Tex. 2003).

 

Waiver

          The
Wellbrocks contend that both Eikenhorst and Trinity waived any objection to
Harris’s expert report by failing to timely object.  Under section 74.351, a defendant may file an
objection to the sufficiency of the report not later than the 21st day after
the date it was served.  Tex. Civ. Prac. & Rem. Code Ann. §
74.351(a).  The Wellbrocks served Harris’s
report on November 22, 2006; therefore, the statute required any objections to the
report be filed by December 13, 2006.  See id. 
Trinity mailed its objection by certified mail on December 13, and the
trial court clerk file stamped it on December 15.  Rule 21a of the Texas Rules of Civil
Procedure authorizes certified mail as a method of service and states that
“service by mail shall be complete upon deposit of the paper . . . in a post
office.”  Tex. R. Civ. P. 21a.  Rule
21a further states that “whenever a party has the right or is required to do
some act within a prescribed period after the service of a notice or other
paper upon him and the notice or paper is served upon by mail . . . three days
shall be added to the prescribed period.” 
Id.  Rule 21a applies to the statutory
requirements contained in the Texas Civil Practice and Remedies Code for
medical malpractice cases.  See Herrera v. Seton NW. Hosp., 212
S.W.3d 452, 459 (Tex. App.—Austin 2006, no pet.); Univ. of Tex. Health Sci. Ctr. v. Gutierrez, 237 S.W.3d 869, 872
(Tex. App.—Houston
[1st Dist.] 2007, pet. denied) (applying rule 21a to section 74.351).  Trinity’s objections therefore were timely
filed under rule 21a because they were mailed by certified mail on December 13,
within the twenty-one day window.  

          The
Wellbrocks assert that Trinity’s motion to dismiss, filed on January 11, 2007,
was also untimely.  Contrary to this
assertion, however, a motion to dismiss is not subject to the twenty-one day
deadline, and in fact, cannot be filed until after the 120-day window in
section 74.351(b) has expired.  Lewis, 2008 WL 1147188 at *1 (“some
challenges—specifically those filed within the first 120 days—cannot seek dismissal or fees until the
120-day window has closed”).  Trinity’s
motion to dismiss was therefore timely filed.

          The
Wellbrocks also contend that Eikenhorst’s objections were untimely filed and
thus waived.  Eikenhorst filed his
objections to Harris’s report on December 18, 2006.  Eikenhorst asserts that his objections were
timely filed under rule 21a because he received Harris’s report by certified
mail and was thus entitled to an additional three days to respond.  See Tex. R. Civ. P. 21a.  The certificate of service attached to
Harris’s report does not indicate the method of service, but includes both
regular mail and certified mail as possible methods.  Applying rule 21a, Eikenhorst’s objections to
the Wellbrocks’ report were due on December 16. 
Because December 16, 2006 was a Saturday, the deadline to file was
extended to December 18, the date Eikenhorst served his objections.  See Tex. R. Civ. P. 4.  We hold that Eikenhorst’s objection to
Harris’s report was timely filed and address the case on the merits.

Harris’s qualifications under sections 74.401 and 74.402

          Both
Eikenhorst and Trinity assert that Harris was not “practicing health care” as
defined by section 74.401 or 74.402 (respectively), and therefore was not
qualified to give an expert opinion in this case.  Section 74.401 defines the qualifications of
an expert witness in a suit against a physician, and section 74.402 defines the
qualifications of an expert witness in a suit against a health care
provider.  See Tex. Civ. Prac. &
Rem. Code Ann. §§ 74.401 & 74.402 (Vernon 2005).

Under section 74.401, “a person may
qualify as an expert witness on the issue of whether the physician departed
from accepted standards of medical care only if the person is a physician who:          (1) is practicing medicine at the time
such testimony is given or was practicing medicine at the time the claim arose;
(2) has knowledge of accepted standards of medical care for the diagnosis,
care, or treatment of the illness, injury, or condition involved in the claim;
and (3) is qualified on the basis of training or experience to offer an expert
opinion regarding those accepted standards of medical care.”  Id. § 74.401(a).   “Practicing medicine” or “medical practice” includes
“training residents or students at an accredited school of medicine or
osteopathy or serving as a consulting physician to other physicians who provide
direct patient care, upon the request of such other physicians.”  Id.
§ 74.401(b).  Section 74.402 is similar
and requires that an expert in a healthcare liability case be “actively
practicing health care.” Id.
§ 74.401(c)(2).  It defines “practicing
health care” as “(1) training health care providers in the same field as the
defendant health care provider at an accredited educational institution; or (2)
serving as a consulting health care provider and being licensed, certified, or
registered in the same field as the defendant health care provider.”  Id. § 74.402(a).

Dr. Harris’s curriculum vitae (CV) and
his expert report indicate that he is licensed in Pennsylvania, Michigan, and Texas,
but has not been in full-time clinical practice since 2001.  His report, however, states that he is active
in preparing Board-Review sessions for radiology residents at The University of
Texas-Houston Medical School, Baylor College of Medicine, and the United States
Naval
Hospital
in San Diego.  He also writes articles for publication in
peer-reviewed journals and for radiologic textbooks.  In addition, his CV states that his present
title is professor emeritus of radiology at The University of Texas-Houston
Medical School, as well as adjunct professor in the department of radiology at
Baylor College of Medicine.  It further
states that Harris is on the active radiology staff at Hermann Hospital.  Taking into consideration that Harris’s CV
and report indicate that he teaches medical students at an accredited school,
as well as remains on the active staff at Hermann Hospital,
we hold that the report sufficiently sets forth that Harris is qualified to
give his expert opinion in this case under both sections 74.401 and 74.402.

Harris’s qualifications as to causation

          Eikenhorst
and Trinity further contend that Harris is not qualified to give an opinion on
causation because he is a radiologist, not a neurologist, and Leonard’s
injuries were neurological.  To offer an expert
opinion “about the causal relationship between the injury, harm, or damages
claimed and the alleged departure from the applicable standard of care in any
health care liability claim, the expert must be a physician who is otherwise
qualified to render opinions on such causal relationship under the Texas Rules
of Evidence.”  Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C)
(Vernon Supp. 2007).  Under the Texas
Rules of Evidence, a witness who is qualified as an expert by knowledge, skill,
experience, training, or education may testify if it will assist the trier of
fact to understand the evidence or to determine a fact issue.  Tex.
R. Evid. 702. 

“Given the increasingly specialized
and technical nature of medicine, there is no validity, if there ever was, to
the notion that every licensed medical doctor should be automatically qualified
to testify as an expert on every medical question. Such a rule would ignore the
modern realities of medical specialization.” 
Broders v. Heise, 924 S.W.2d
148, 152 (Tex.
1996).  Many cases have thus excluded an
expert’s report when the report did not prove the expert was qualified to
address causation in the specified field. 
See, e.g., id. (emergency room
physician not qualified to testify about brain injury because his opinions were
speculative); Forrest v. Danielson,
77 S.W.3d 842, 848 (Tex. App.—Tyler 2002, no pet.) (case dismissed when
orthopedic surgeon did not indicate that he was familiar with procedures used
by surgeons in that case).  These cases,
however, are distinguishable.  Unlike in Broders, in which the expert never
testified that he knew from either experience or study the effectiveness of the
treatments in general, Harris states, in his report, that his “experience,
background, and continuing experience in the very area that is at issue in this
case—the acutely injured cervical spine—supports [sic] the opinions” that he
stated therein.  He also states that “it
is my experience, having interpreted such imaging and thereafter discussing the
findings with orthopedic surgeons and neurosurgeons that surgical intervention
would have immediately followed.” 
Harris, therefore, clarifies that he has experience in this type of
injury, unlike the experts in the above-cited cases.  In addition, Harris’s CV indicates that he
has published numerous articles concerning this type of injury, including Acute Cervical Spine Trauma, Acute Injuries of the Spine, and A Practical Classification of Acute Cervical
Spine Injuries.  Given Harris’s
training and experience with the type of injury at issue, the trial court did
not abuse its discretion in ruling that Harris is qualified to give an opinion
on causation.

Causation

          Eikenhorst
and Trinity contend that the Wellbrocks’ expert report is deficient as a matter
of law on the issue of causation because it (1) fails to distinguish Leonard’s
pre-existing condition and injuries, and (2) fails to describe the causal
relationship between Eikenhorst’s and Trinity’s alleged negligence and
Leonard’s alleged damages.  

          Pre-existing Injuries

          Both
Eikenhorst and Trinity contend that the report is deficient as to causation
because it fails to consider Leonard’s pre-existing injuries.  Both appellants cite to Ballan and Barko for
support.  Ballan v. Gibson, 151 S.W.3d 281 (Tex. App.—Dallas 2004, no pet.); Barko v. Genzel, 123 S.W.3d 457 (Tex.
App.—Eastland 2003, no pet.).

          In
Ballan, a patient died in the
emergency room as a result of arteriosclerotic cardiovascular disease, and the
plaintiffs brought suit alleging his doctor was negligent by his failure to
treat five cardiac risk factors.  The
expert’s report did not state how the doctor’s alleged failure to act regarding three of the risks
caused Ballan’s death, nor did it rule out the factors beyond the doctor’s
control as the cause of death.  Ballan, 151 S.W.3d at 284.  The court held that
the expert report was conclusory and affirmed the motion to dismiss.  Id.

          In
Barko, the plaintiff alleged that her
emergency room physician negligently failed to diagnose and treat her disc
re-herniation, which she asserted led to permanent neurological damage and a
miscarriage.  Barko, 123 S.W.3d at 458. 
The court held that the report was insufficient to satisfy the statutory
requirements because it: (1) did not indicate that the plaintiff would have
recovered from the back injury but for the doctor’s negligence; (2) did not
state that the back surgery would have been avoided but for the doctor’s
negligence; and (3) did not make any attempt to eliminate either the back
injury itself or the attempt to surgically repair it as a potential cause of
the permanent neurological damage.  Id. at 460–61.

          Unlike
the reports in Barko and Ballan, Dr. Harris’s report does address
Leonard’s pre-existing injuries.  In his
report, he states that the injuries were aggravated and exacerbated by
Eikenhorst’s and Trinity’s negligence and that this aggravation resulted in his
permanent impairments.  He further states
that the failures by Eikenhorst and Trinity to follow the standard of care
“directly caused the aggravation of his serious spinal injury . . . and thereby
resulted in delayed treatment with permanent disability.”  He also opines that the proper evaluation and
treatment would have “led to greatly recovered health status by Mr. Wellbrock,
instead of his current permanent impairment.” 
Harris therefore considered Leonard’s existing injuries and concluded
that it was the aggravation of these injuries that caused his permanent
impairment, not the pre-existing injuries themselves.

          Causation as to Eikenhorst

          In
regard to Eikenhorst’s causation, Harris opined that Eikenhorst’s failure to
communicate his CT scan findings and his failure to properly diagnose Leonard’s
injury caused a delay in treatment and aggravation of Leonard’s injuries.  Harris states that had Eikenhorst properly
diagnosed Leonard with BID, surgery would have immediately followed, relieving
the pressure on the spinal cord and stabilizing the spine, which would have led
to greatly recovered health status by Leonard, instead of his current permanent
impairment.  Eikenhorst contends that the
report contains gaps that prevent it from being a “fair summary.”  He contends that Harris fails to explain how
failing to identify Leonard’s condition aggravated his injury.  We disagree. 
Harris opined that in reasonable medical probability, Leonard would have
received immediate surgery and had a greatly recovered health status had he
obtained an early diagnosis.  Thus, the
failure of Eikenhorst to properly diagnose Leonard or communicate his CT
results to the emergency physician prevented the early diagnosis which would
have avoided Leonard’s permanent impairments. 


In support of his causation argument,
Eikenhorst relies on Bowie,
where the plaintiff alleged that a hospital’s physician’s assistant misread or
misplaced an x-ray and, therefore, did not discover that the plaintiff had
fractured her foot.  Bowie,
79 S.W.3d at 50. Approximately one month later, the plaintiff’s orthopedic
surgeon discovered the fractured foot.  Id.  The plaintiff filed an
expert report, which stated that had the x-ray been properly read, she “would
have had the possibility of a better outcome.”  Id.
at 51. The Supreme Court, after recognizing that a report need not use any
particular magical words, held that the trial court could have reasonably
determined that the report did not represent a good-faith effort to summarize
the causal relationship.  Id. at 53. The court
noted that the report simply opined that the plaintiff had a “possibility of a
better outcome,” and did not sufficiently “[link] the expert’s conclusion (that
[the plaintiff] might have had a better outcome) to [the hospital’s] alleged
breach (that it did not correctly read and act upon the x-rays).”  Id.

Eikenhorst also relies on Longino, in which the plaintiffs alleged
that the doctor failed to perform the tests necessary to diagnose their child’s
meningitis earlier and the delay caused the child’s neurological injuries.  Longino
v. Crosswhite, 183 S.W.3d 913, 915 (Tex. App.—Texarkana 2006,
no pet.).  The plaintiffs filed an expert
report that stated only “that the delay in diagnosis caused significant and
permanent neurological injuries.”  Id. at 918.  The appellate court reversed the trial court
and determined that the report was insufficient on causation because it failed
to “inform the defendant of the specific conduct the plaintiff has called into
question” and did not contain specific information concerning Longino’s
conduct.  Id.

In contrast to these cases, Harris
opined in his expert report that Eikenhorst’s breach of his standard of care
permitted exacerbation of Leonard’s spinal injury by prolonged pressure on the
spinal cord that would have been relieved with proper care.  Harris states in his report that “surgical
intervention would have immediately followed the diagnosis, thereby relieving
the pressure on the spinal cord, and stabilizing the spine.”  See Harris County Hosp. Dist. v. Garrett, 232
S.W.3d 170, 181 (Tex.
App.—Houston
[1st Dist.] 2007, no pet.) (holding report sufficient that stated that delay in
diagnosis of cancer led to poor forecast when delay caused advancement of
disease and limited availability of treatment options); Simonson v. Keppard, 225 S.W.3d 868, 875–77 (Tex. App.—Dallas
2007, no pet.) (holding report not conclusory which stated that had deceased
received proper diagnosis, deceased would have been admitted to hospital and
deterioration would have been prevented or lessened); Linan v. Rosales, 155 S.W.3d 298, 305–06 (Tex. App.—El Paso 2004,
pet. denied) (affirming verdict in favor of plaintiff for doctor’s failure to
timely diagnose cancer based on evidence that during two-month period cancer “involved
the lymph vessels” and caused edema and that advancement of cancer eliminated
option of breast conserving therapy); In
re Barker, 110 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, no pet.) (finding
expert report stating that negligent failure to recognize medical condition and
delay in treatment increased severity of plaintiff’s injuries to be sufficient).
  The report did not only state that a
delay in diagnosis caused permanent injuries; it linked Eikenhorst’s specific
conduct to a delay in diagnosis, leading to increased and prolonged spinal
pressure, resulting in Leonard’s permanent impairment.

We conclude that Dr. Harris, in his
report, provided a fair summary of the causal relationship between Eikenhorst’s
failure to meet the pertinent standard of care and the Wellbrocks’ damages, and
adequately informed Eikenhorst of the specific conduct the Wellbrocks called
into question.  Accordingly, we hold that
the trial court did not abuse its discretion in denying Eikenhorst’s motion to
dismiss the Wellbrocks’ health care liability claims.

Causation as to Trinity

In regard to Trinity’s causation,
Harris opined that the radiology department’s failure to keep Leonard’s spine
immobilized during the x-ray procedures led to further damage to his already
injured spine, resulting in permanent impairments.  He further states that the radiology
department’s failure to include the imaging report in Leonard’s chart, to
ensure its review by the emergency department, “caused a delay in the treatment
of Mr. Wellbrock, thereby aggravating his spinal cord injury, which resulted in
permanent impairments to Mr. Wellbrock because of the prolonged compression of
the spinal cord until his treatment at St. Luke’s three days later.”  Like Eikenhorst, Trinity contends that
Harris’s report is conclusory because it does not describe how Trinity’s
alleged negligence caused Leonard’s injuries. 


Trinity also relies on Bowie and Longino to support its contention. 
However, unlike the reports in Bowie
and Longino, Harris outlined
Trinity’s specific conduct, which led to the aggravation of Leonard’s injuries
and resulted in his permanent impairment. 
In addition, Harris states that Trinity’s failure to include the imaging
report in Leonard’s chart led to a delay in his treatment, which caused
prolonged compression of his spinal cord and also attributed to his permanent
impairment.  The report thus does not
merely state that a delay in treatment caused permanent impairment, but explains
why the delay caused that result.  The
report therefore provided a fair summary of the conduct in question.  Accordingly, we hold that the trial court did
not abuse its discretion in denying Trinity’s motion to dismiss the Wellbrocks’
health care liability claims.

Conclusion

          We
conclude that we have jurisdiction over this appeal and therefore deny the
Wellbrocks’ motions to dismiss for lack of jurisdiction.  We further conclude that the trial court did
not abuse its discretion in denying Eikenhorst’s and Trinity’s motions to
dismiss.  We therefore affirm the
judgment of the trial court.

 

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Jennings and Bland.











[1]               Lewis v. Funderburk, No. 06-0518, 2008 WL 1147188, at *1 (Tex. Apr. 11, 2008)