**Guadalupe C. CORONEL, Individually and As Representative of the Estate of Veronica Coronel, Deceased, Appellant,**

v.

**PROVIDENCE IMAGING CONSULTANTS, P.A., and Scott Blumenfeld, M.D. Appellees.**

No. 08–14–00140–CV

Court of Appeals of Texas, El Paso.

February 29, 2016

---

Alfonso L. Melendez, Attorney at Law, El Paso, TX, for Appellant.

David S. Jeans, Ray, Valdez, McChristian & Jeans, El Paso, TX, for Appellees.

Before McClure, C.J., Rodriguez, and Hughes, JJ.

## OPINION

YVONNE T. RODRIGUEZ, Justice

The issue in this medical malpractice case is whether a radiologist's failure to personally communicate his suspicions of cancer after reviewing a patient's ultrasound proximately caused the patient's death by depriving her of years of oncological treatment. The radiologist asserted he was not a proximate cause of the patient's death because the emergency room physician testified that, even had he been aware of the radiologist's findings, he would not have altered the patient's course of treatment. The trial court agreed, granting the radiologist's hybrid motion for summary judgment. On appeal, the patient's representative contends the trial court erred in concluding that she did not raise genuine issues of material fact on causation. We agree and, therefore, reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 12, 2007, Veronica Coronel visited Sierra Medical Center's (hereinafter, "SMC") emergency room complaining of weakness, vaginal bleeding, and pelvic pain. She was seen by Dr. Kenneth Berumen, the then-chief of the emergency room, who ordered a pregnancy test and a pelvic ultrasound. The ultrasound was performed by a technician, who prepared a preliminary report listing, but was not responsible for interpreting the "findings and measurements" for Dr. Berumen's review. One of the findings listed in the preliminary report was abnormal endometrial thickening, a possible indication of cancer. Dr. Berumen, aware of the abnormality and its potential significance, discharged Veronica later that day with written instructions for her to obtain follow-up care with a family practitioner or gynecologist "in the next few days" to confirm or exclude cancer as a source of her pelvic pain.

The following day, Dr. Scott Blumenfeld, a radiologist employed by Providence Imaging Consultants, P.A. (hereinafter, "PIC"), reviewed the ultrasound and prepared a report memorializing his diagnostic imaging findings. Of particular significance here, Dr. Blumenfeld noted:

> The endometrial echo complex is markedly thickened at 3.1 cm thickness. It is heterogeneous. Correlation with a pregnancy test is recommended. Early intrauterine pregnancy with threatened abortion or gestational trophoblastic disease not excluded. If pregnancy test negative, biopsy would be suggested to differentiate endometrial polyp, submucosal fibroid or endometrial carcinoma.

Dr. Blumenfeld entered his report into SMC's hospital information system, and a hard copy of it was sent to the emergency

department. However, Dr. Blumenfeld did not personally provide the report or communicate its contents to Dr. Berumen, a designee, or to Veronica, who did not learn of the report until December 2008. Two months after learning of the report, Veronica had an endocervical biopsy performed. The results confirmed she was suffering from Stage IV, cervical carcinoma. Veronica lived four more months before dying of metastatic cervical cancer on June 15, 2009. Veronica's mother, Guadalupe Coronel, sued Drs. Berumen and Blumenfeld, SMC, and PIC for medical malpractice, alleging they "were negligent in failing to provide proper care for the diagnosis and treatment of [Veronica]'s cancer." After answering, Dr. Blumenfeld and PIC (collectively, "Appellees"), filed a hybrid no-evidence and traditional summary judgment motion on causation. They asserted Guadalupe could not prove they proximately caused Veronica's injuries "because despite the alleged breach of the standard of care, Dr. Berumen . . . would have done nothing differently regarding [Veronica's] . . . care and treatment plan . . . if he had received . . . [Dr. Blumenfeld's] . . . report. . . ." In support of their assertion, Appellees cited *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238 (Tex.2008), for the proposition that a plaintiff cannot show, by a reasonable medical probability, her injuries were caused by a physician's failure to provide additional information to a treating physician when the treating physician testifies that additional information would not have changed the course of treatment. They also attached to their motion the depositions of Dr. Berumen and Dr. Marc D. Kaye, Guadalupe's radiology expert witness.

In her response, Guadalupe countered with two distinct theories. The first was her argument that Dr. Berumen's testimony was inadequate to support summary judgment because "it [was] inconsistent, unclear, and subject to contradictions." The second was her assertion "that providing the report directly to Dr. Berumen would have made a difference in the outcome" because, "if Dr. Berumen had told [Veronica] that the ultrasound was abnormal, [she] would have gone to the doctor." Specifically, Guadalupe alleged that "Dr. Blumenfeld's failure to directly communicate to a responsible health care provider the ultrasound findings of possible cancer and his recommendations for MRI and biopsy was a substantial cause of Veronica['s] . . . death" because "[Veronica] would have . . . obtain[ed] a timely biopsy," "within 30 days from her discharge from the emergency department," "diagnos[ing][her] with early uterine cancer Stage I, which carries a prognosis of at least 60%, five year survival[ ]" "and treatment." To her response, Guadalupe attached portions of the depositions of Dr. Kaye, Dr. Berumen, Dr. Philip John Di Saia, her expert gynecological oncologist, and Cruz Isabel Carrasco, the woman who accompanied Veronica to the emergency room.

The trial court granted the hybrid motion for summary judgment without explanation:

It is therefore ordered that Defendants Providence Imaging Consultants, P.A. and Scott Blumenfeld, M.D.'s Motion for Summary Judgment is hereby granted. It is ordered that Defendants Providence Imaging Consultants, P.A. and Scott Blumenfeld, M.D.'s [sic] are dismissed from this case and that Plaintiffs' claims against Defendants Providence Imaging Consultants, P.A. and Scott Blumenfeld, M.D.'s [sic] in the above styled and numbered cause are dismissed with prejudice. It is ordered that each party shall bear their own costs.

## SUMMARY JUDGMENT STANDARD OF REVIEW

We review a summary judgment *de novo. Mid–Century Ins. Co. v. Ademaj,* 243 S.W.3d 618, 621 (Tex.2007).

### No–Evidence

When reviewing a no-evidence summary judgment, we ask whether the non-movant adduced evidence raising a genuine issue of material fact on the challenged elements. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.,* 12 S.W.3d 827, 832 (Tex.App.–Dallas 2000, no pet.); *see also* Tex. R. Civ. P. 166a(i). In conducting our inquiry, we disregard all conflicts in the evidence and accept as true all evidence supporting the non-movant. *Connor v. Waltrip,* 791 S.W.2d 537, 539 (Tex.App.–Dallas 1990, no writ). If the evidence is so weak as to create only a mere surmise or suspicion of a fact's existence, summary judgment is proper. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004); *Smith v. Deneve,* 285 S.W.3d 904, 909 (Tex.App.–Dallas 2009, no pet.). On the other hand, if the evidence is sufficient for reasonable and fair-minded jurors to differ in their conclusions, summary judgment is improper. *Hamilton v. Wilson,* 249 S.W.3d 425, 426 (Tex.2008)(per curiam).

### Traditional

When reviewing a traditional summary judgment in favor of a defendant, we determine whether the defendant conclusively disproved an element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex. 1997); *Smith,* 285 S.W.3d at 909; *see also* Tex. R. Civ. P. 166a(c). We take evidence favorable to the non-movant as true, and we indulge every reasonable inference and resolve every doubt in the non-movant's favor. *Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 800 (Tex.1994).

## MEDICAL MALPRACTICE (CAUSATION)

■ Coronel argues "there was more than a scintilla of evidence that Dr. Blumenfeld's negligence in failing to communicate his abnormal findings of the ultrasound and recommendations for follow-up to a responsible party in the emergency department was a proximate cause of Veronica['s] . . . harm." We agree.

### Applicable Law

■ In a medical malpractice case, a plaintiff must prove four elements: (1) a duty by the physician to act according to a certain standard; (2) a breach of the applicable standard of care; (3) injury or harm to the plaintiff; and (4) a causal connection between the breach of the applicable standard of care and the injury or harm. *Morrell v. Finke,* 184 S.W.3d 257, 271 (Tex. App.–Fort Worth 2005, pet. denied); *Linan v. Rosales,* 155 S.W.3d 298, 302 (Tex. App.–El Paso 2004, pet. denied); *Krishnan v. Ramirez,* 42 S.W.3d 205, 212 (Tex. App.–Corpus Christi 2001, pet. denied). Here, we are concerned with causation, which must be based upon reasonable medical probability. *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex. 1995). The quantum of proof required is "simply 'that it is more likely than not' that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Mem. Hosp.,* 858 S.W.2d 397, 400 (Tex.1993)(Internal citations omitted). In other words, the wrongful act need only be a substantial factor in bringing about the harm. *Southwest Key Program, Inc. v. Gil–Perez,* 81 S.W.3d 269, 274 (Tex. 2002).

## Discussion

Appellees do not challenge Dr. Kaye's opinion that Dr. Blumenfeld breached the applicable standard of care by failing to communicate his suspicions of cancer directly to Dr. Berumen or to a responsible party in SMC's emergency department.[1] Nor do they challenge Drs. Kaye's and Di Saia's opinions that Veronica was harmed because the delay in diagnosing her cancer allowed it to advance from a potentially curable, early stage to an advanced, metastatic disease with no chance of survival. Instead, Appellees challenge the causation element of Guadalupe's negligence claim against them. Specifically, they contend Guadalupe "failed to offer any proof of causation from the pled theory of negligence against [them] and . . . even offered affirmative proof disproving causation." In contending there is no evidence of causation and they have disproved causation as a matter of law, Appellees rely solely on Dr. Berumen's testimony that, even had he known of Dr. Blumenfeld's suspicions of cancer, he would not have changed his course of treatment for Veronica because he, in fact, disclosed to her the possibility of cancer and recommended further action on her part. To buttress their argument,

Appellees cite the afore-mentioned *Hogue.* Appellees' reliance on *Hogue* and Dr. Berumen's testimony is misplaced.

*Hogue* is a case about allocating responsibility for patient care when hospital services are out-sourced. There, the jury found a hospital grossly negligent in a patient's death for failing to timely diagnose an acute mitral valve leakage. 271 S.W.3d at 245. The patient, suffering from severe respiratory distress, was admitted to the hospital in the morning and, after being stabilized, was transferred to ICU shortly after noon. *Id.* at 243–44. Approximately three hours later, the treating physician ordered a "stat" echocardiogram. *Id.* at 244. Unbeknownst to him, the hospital not only had outsourced its echocardiogram services but also contractually agreed not to pay an additional fee for guaranteed response times in emergencies. *Id.* Consequently, the echocardiogram was completed approximately three hours after it was ordered. *Id.* at 244–45. The echocardiogram identified severe, acute mitral valve leakage requiring emergency surgery, and the patient was transferred to another hospital for that proce-

---

1. But Appellees do maintain that Guadalupe cannot obtain a favorable judgment on her theory of liability based on Dr. Kaye's opinion that Dr. Blumenfeld should have contacted Dr. Berumen's designee because she neither pled it nor proved it with competent summary judgment evidence. Of course, it is irrelevant that Guadalupe's petition cannot support a judgment in her favor at this stage of the proceedings because she is not moving for summary judgment on her cause of action. In any event, we note that, in its best-practice guidelines for communicating diagnostic findings, the American College of Radiology (ACR) recommends that a radiologist "[c]ommunicat[e] by telephone or in person to the treating or ordering physician or his/her representative . . . [to] assure [] receipt of . . . findings" "that the interpreting physician reasonably believes may be seriously adverse to

the patient's health and may not require immediate attention but, if not acted on, may worsen over time and possibly result in an adverse patient outcome." *ACR Practice Parameter for Communication of Diagnostic Imaging Findings* (2014), Section II (Diagnostic Imaging Reports)(C)(2)(a)(iii), (c). This method of non-routine communication, according to the guidelines, "may be particularly applicable when there is a potential break in the continuity of care (such as can occur in emergency department encounters or the outpatient setting) that is unexpected by the treating or referring physician." *Id.,* Section II (Diagnostic Imaging Reports)(C)(2)(a)(iii). Although the guidelines are best practices, in the words of the ACR, they "are not intended, nor should they be used, to establish a legal standard of care." *Id.,* Preamble, Section II.

dure. *Hogue*, 271 S.W.3d at 245. Shortly after arriving, he died. *Id.*

The patient's wife and two sons sued the hospital, asserting survival and wrongful-death claims. *Id.* Among the defenses raised by the hospital was the contention that the patient was contributorily negligent by failing to disclose a prior heart murmur diagnosis. *Id.* at 243, 245–46. The trial court submitted this issue to the jury but did so "in an unusual third phase of the trial separate from the general liability question." *Id.* at 243. The jury did not find the patient contributorily negligent. *Id.* at 245. On appeal, the hospital asserted the trial court erred in submitting the issue in this manner. *Id.* The Texas Supreme Court disagreed, holding it was unnecessary to "decide whether the unusual submission of the contributory negligence question was error" "[b]ecause the hospital did not present legally sufficient evidence of contributory negligence." *Id.* at 243. The Court concluded that the evidence offered by the hospital was nothing more than mere conjecture or possibility and, therefore, did not constitute evidence that the hospital's diagnosing doctors would have acted differently if the patient had disclosed his heart murmur diagnosis. *Id.* at 246–47. The evidence deemed inadequate by the supreme court consisted of: (1) the testimony of an emergency room physician that, if he had known about the prior diagnosis, he "perhaps" would have moved a cardiac source higher in his differential diagnosis and that he "possibly" would have considered consulting with a cardiologist; and (2) the testimony of the hospital's critical care pulmonary specialist that information about a prior heart murmur would not have been useful. *Id.*

Putting aside the question whether *Hogue* stands for the proposition, as Appellees advance, that in a medical malpractice case where proximate cause is contingent on a third-party's actions, a plaintiff can never prove causation when the third party testifies that he would not have done anything differently, there are two fatal flaws in Appellees' position. First, contrary to their assertion on appeal, a factual dispute exists regarding what Dr. Berumen might have done if in possession of certain information.[2] Second, Guadalupe offered evidence as to what reasonably-qualified physicians in Drs. Berumen's and Blumenfeld's position should have done with the undisclosed information and whether the failure to disclose the information was a proximate cause of Veronica's injuries.

With respect to Dr. Berumen's testimony that he would not have done anything differently even if in possession of Dr. Blumenfeld's report, it was improper for the trial court to give it dispositive effect because Guadalupe presented specific evidence that Dr. Berumen did, in fact, do something different than he claimed to have done. Dr. Berumen testified that, although he did not remember interacting with Veronica, he would have informed her of the abnormal ultrasound findings and the possible cancer diagnosis. Carrasco, on the other hand, testified Dr. Berumen told her and Veronica "there was nothing wrong." According to Carrasco, had Dr. Berumen advised them the ultrasound was abnormal and Veronica needed follow-up care with a gynecologist, Veronica would have seen a gynecologist. Carrasco's testimony in this regard is consistent with

---

2. Appellees take the position that, for various reasons, the veracity of Dr. Berumen's testimony "that even if he had Blumenfeld's report, it would not have changed his patient plan and that after [Veronica] was discharged, [he] had no duty to provide [her] with the report" is unassailable and supports summary judgment in their favor.

evidence that Veronica never followed up with this potentially life-threatening diagnosis until she learned of Dr. Blumenfeld's report. Furthermore, the very manner and method under which Veronica was ultimately diagnosed is entirely consistent with Dr. Kaye's theories on why Appellees were negligent. As mentioned above, Veronica obtained a biopsy shortly after learning of Dr. Blumenfeld's report.

With respect to adducing evidence of what reasonably well-qualified physicians in Drs. Berumen's and Blumenfeld's position should have done with the undisclosed information and whether the failure to disclose the information was a proximate cause of Veronica's injuries, Guadalupe proffered the testimony of Dr. Kaye. He opined that, in reasonable medical probability, Dr. Blumenfeld's failure to personally communicate the results of his findings to Dr. Berumen, or his designee, so as to assure Dr. Berumen understood the significance of his findings, which had serious implications for Veronica's health, violated the applicable medical standard of care and resulted in a delay in her diagnosis and treatment. Dr. Kaye was also critical of Dr. Berumen's role in Veronica's care for discharging her before receiving the radiology report in light of Dr. Berumen's admission that he did not interpret ultrasound images. Unlike the medical testimony offered by the hospital in *Hogue*, Dr. Kaye's testimony was not speculative and insufficient to raise a question of fact on the element of causation. To the contrary, Dr. Kaye's testimony constituted some evidence establishing a reasonable medical probability that the course of Veronica's treatment was influenced by Dr. Blumenfeld's failure to communicate information to Dr. Berumen or his designee.

In sum, Dr. Berumen's testimony refuting the suggestion that any deficiency in Dr. Blumenfeld's reporting proximately caused Veronica's injuries does not in any way vitiate Guadalupe's theory of causation; it merely confirms a controversy. *Cf. Methodist Hosp. v. German*, 369 S.W.3d 333, 336–337, .346–49 (Tex.App.–Houston [1st Dist.] 2011, pet. denied)(relying on *Hogue* to conclude that nurses' alleged failure to communicate to treating physicians their observations about patient's falling platelet count, which suggested allergic reaction to the heparin used to save his life, was not a proximate cause of patient's amputations because he failed to prove by reasonable medical probability that alleged breach influenced course of treatment, in light of undisputed evidence, including uncontradicted testimony from treating physicians, that patient's symptoms were consistent with other diagnoses and that he would have died if they had called for hematology consult to confirm patient's allergy to heparin). Consequently, a fact finder should be allowed to consider the expert evidence and the factual evidence discussed above to determine whether a reasonably well-qualified physician in Dr. Blumenfeld's position would have directly informed Dr. Berumen or his designee of his findings and whether Carrasco or Dr. Berumen are telling the truth.

## CONCLUSION

The trial court's judgment is reversed and the cause is remanded for proceedings consistent with this opinion.