

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00030-CV

———————————————

RODOLFO DE LA PEÑA, INDIVIDUALLY, ON BEHALF OF ALL WRONGFUL
DEATH BENEFICIARIES AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF BEATRIZ DE LA PEÑA, Appellant

V.

KEVIN R. GORDON, M.D., Appellee

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-263281-12

Before Gabriel, Pittman, and Bassel, JJ.
Memorandum Opinion by Justice Pittman

# MEMORANDUM OPINION

A jury found in favor of Appellee Kevin R. Gordon, M.D., on the health care liability claim brought against him by Appellant Rodolfo De La Peña (Rodolfo), individually, on behalf of all wrongful death beneficiaries, and as personal representative of the estate of his wife Beatriz De La Peña (Beatriz).[1] In three issues, Rodolfo contends that the evidence was legally and factually insufficient to support the jury's finding of no negligence, that the trial court erred in denying his motion for judgment notwithstanding the verdict, and that the trial court erred in denying his motion for new trial. We affirm.

## BACKGROUND

On December 20, 2010, Beatriz went to Trinity Park Surgery Center for a laparoscopic hysterectomy and hernia repair. Dr. Gordon performed the hysterectomy. Dr. Jason Harrison performed the hernia repair. During the surgery, upon discovering the severity of Beatriz's endometriosis, Dr. Gordon decided to remove her ovaries and to convert from laparoscopic to open surgery. The surgery lasted two hours. Dr. Gordon then transferred Beatriz to Medical Center Arlington (MCA) for monitoring. Dr. Gordon was the admitting and attending physician. On the evening of December 21, while still at MCA, Beatriz died from a pulmonary embolism (PE).

---

[1]Because Rodolfo De La Peña and Beatriz De La Peña share the same last name, we use their first names to distinguish them in this opinion.

Rodolfo sued Dr. Gordon for failing to prevent the PE.[2]  He alleged that Dr. Gordon had negligently failed to properly perform the medical treatment necessary to Beatriz's welfare and to provide proper assessment and treatment for the prevention of deep vein thrombosis (DVT) and PE.  Rodolfo pled for damages for himself and the couple's children under Texas's Wrongful Death Act.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 71.002.

At trial, Rodolfo called Dr. Paul E. Marik, an internist and critical care specialist, to testify as an expert.  Dr. Marik testified that a DVT can cause a PE and that patients at risk for a DVT must be given appropriate DVT prophylaxis.  Dr. Marik explained that under the applicable guidelines, Beatriz had a high DVT risk and that patients with a high DVT risk must be given certain blood thinners, wear a sequential compression device (SCD), or be ambulating, or have some combination of the three options.  Dr. Gordon agreed with this part of Dr. Marik's testimony.

Dr. Marik further testified that Dr. Gordon breached the applicable standard of care by failing to provide Beatriz with appropriate DVT prophylaxis.  Either Rodolfo or one of his and Beatriz's daughters were in her hospital room at all times, and they testified that while Beatriz was at MCA, she walked no more than a few steps from

---

[2]He also sued Dr. Harrison, Trinity Park, MCA nurse Beverly Cobb, and Dr. John Tiu, a critical care doctor who attempted to treat the PE at MCA.  He nonsuited without prejudice Tiu, Trinity Park, and Nurse Cobb.  Prior to trial, the trial court signed an agreed order dismissing with prejudice the claims against MCA and an order dismissing with prejudice the claims against Dr. Harrison.

her bed to a chair and back and did not have on an SCD. Dr. Gordon testified that he did not order that Beatriz be administered blood thinners because of a risk of postoperative bleeding, but he presented evidence contradicting Dr. Marik's testimony about whether he ordered an SCD and whether Beatriz was ambulating.

The jury found that there was no negligence by Dr. Gordon that proximately caused Beatriz's death. Rodolfo filed a motion for new trial and a motion for JNOV. The trial court denied the motion for JNOV and rendered judgment that Rodolfo take nothing. The motion for new trial was denied by operation of law.

## STANDARD OF REVIEW

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). If a party is attacking the legal

4

sufficiency of an adverse finding on an issue on which the party had the burden of proof, and if no evidence supports the finding, we review all the evidence to determine whether the contrary proposition is established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

When reviewing a party's assertion that the evidence is factually insufficient to support a finding on which the party had the burden of proof, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the failure to find is against the great weight and preponderance of the credible evidence. *Dow Chem.*, 46 S.W.3d at 242; *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681–82 (Tex. 2006).

## DISCUSSION

### I. The Jury's Verdict Is Supported by Sufficient Evidence.

In his first issue, Rodolfo contends that the jury's verdict is not supported by legally and factually sufficient evidence. However, in his brief he discusses only the evidence contrary to the finding and fails to discuss the evidence supporting the finding. *See In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (stating that factual sufficiency review requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding). After reviewing the record, we hold that sufficient evidence supports the jury's verdict.

The evidence established that upon Beatriz's admission to MCA, she was at high risk for a DVT. Dr. Marik testified that DVT prevention guidelines published by various health organizations set the standard of care for DVT prevention and specify the options for high-risk patients. Dr. Gordon equivocated about what the applicable standard of care requires for DVT prevention, but he agreed with Dr. Marik's testimony about what the guidelines on which Dr. Marik relied called for regarding DVT prophylaxis options, and defense witness Dr. Russell Dickey stated that "[t]he standard of care is that you follow a guideline to prevent DVT." Both sides presented evidence that under applicable guidelines, there are three recognized options for DVT prevention: (1) chemical or pharmacological prophylaxis, primarily in the form of either low-dose unfractionated heparin or low-molecular-weight heparin (Lovenox); (2) mechanical prophylaxis by way of SCDs, which squeeze the legs[3]; or (3) ambulating. However, as we discuss below, the jury heard conflicting evidence about whether Dr. Gordon ordered appropriate DVT prevention measures at MCA, whether chemical prophylaxis was contraindicated for Beatriz, whether she wore an SCD at MCA, and whether she was walking enough for DVT prevention.

---

[3]Dr. Harrison testified that "[b]asically SCDs are supposed to simulate the act of walking" and that walking "stimulates proteins to start a fibrinolytic system, whatnot, to try to prevent the coagulation cascade from—from coming down and making a DVT."

### A. Sufficient Evidence Supports a Finding that Dr. Gordon Properly Declined to Order Chemical Prophylaxis.

Dr. Gordon did not dispute that Beatriz had no chemical prophylaxis administered. He testified that he decided against using it because Beatriz was at risk for bleeding, and thus using an anticoagulant could be deadly.

Dr. Gordon provided two bases for his opinion that Beatriz was at risk for bleeding. First, a lab test measured her pre-surgery hemoglobin concentration level at 9.5, but a measurement an hour after surgery, run on a different machine at Trinity Park, showed her hemoglobin concentration at 6.4. A repeated test at Trinity Park an hour later had the same result. The difference between 9.5 and 6.4 represents about three units of blood. That much blood loss could indicate she was bleeding internally, which would contraindicate chemical prophylaxis.

The two sides presented conflicting evidence about whether the hemoglobin concentration test results from Trinity Park were accurate and consequently whether Dr. Gordon reasonably relied on them to conclude that chemical prophylaxis was contraindicated. Dr. Marik pointed out that a lab test performed at MCA at 5:00 p.m. on the same day measured Beatriz's hemoglobin concentration level at 8.2. Dr. Marik opined that it was medically impossible for Beatriz's hemoglobin concentration levels to increase that much in that little time. "That does not happen in medical science"— a human cannot transfuse themselves, and "the only way the blood hemoglobin could have gone from a 6.4 to 8.2 is either [Beatriz] received a blood transfusion, which we

know didn't happen, or the two previous [6.4] numbers were spurious." Dr. Marik further opined that, considering that Beatriz showed no signs or symptoms of active bleeding, Dr. Gordon should have concluded that the earlier Trinity test results were inaccurate and that Beatriz was not actively bleeding. He testified that in that case, given Beatriz's high risk for a DVT, Dr. Gordon should have administered an anticoagulant. Dr. Gordon disputed that Beatriz's stable vital signs ruled out an active bleed. He explained that she had chronic anemia, and her body had therefore adapted to having less blood and had developed "a lot of defense mechanisms to keep blood going to your brain, keep that blood pressure up." However, Dr. Gordon offered no probative evidence to contradict Dr. Marik's testimony that Beatriz's hemoglobin concentration level could not have risen that quickly.[4]

Nevertheless, Dr. Gordon offered a second, independent reason Beatriz was at risk for bleeding: the state of Beatriz's blood vessels. Dr. Gordon explained that after her surgery, Beatriz had what he described as extensive "raw surface" internally, giving her a "significant high risk" for postoperative bleeding. Dr. Gordon stated that while Beatriz had no bleeding arteries at the end of the surgery, during the procedure she

---

[4]Dr. Harrison testified that the different results were not surprising given that the test with the 6.4 result was done using a machine at Trinity Park and the later 8.2 reading came from a different machine in a lab at MCA. Dr. Harrison was asked if he agreed with Dr. Marik that the 6.4 was "impossible because she's too close to being out of surgery and her metabolism could not equilibrate within this time frame," to which he responded, "Not at all," but did not explain the basis for that opinion. No defense witness explained how Beatriz's hemoglobin concentration could have increased that much in that time period without a transfusion.

had a large amount of "ooze," that is, blood oozing from blood vessels. He explained that once in surgery, he and Dr. Harrison discovered that Beatriz had severe endometriosis, and Dr. Harrison testified that oozing can occur from the inflammation that endometriosis causes. Dr. Harrison stated that "oozing just basically doesn't stop with the normal things that we use to try to stop" bleeding. He testified that with that kind of oozing, the surgeon can end the procedure with no evidence of bleeding, but then, once the patient is no longer anesthetized and their blood pressure goes up, "[t]hat oozing can . . . start up again." Dr. Gordon agreed that once the patient's blood pressure "get[s] turned up," "all of a sudden those areas that you didn't appreciate that were oozy, now can be a little bit more . . . of a concern." And, Dr. Peter Heidbrink,[5] testifying for Dr. Gordon, confirmed that chemical prophylaxis can cause "significant postoperative bleeding" because "[t]hat's their job, is to prevent clotting, so if you're preventing clotting, then you're—you're maybe propagating bleeding."

Dr. Marik told the jury that even if a patient is undergoing a type of surgery that generally carries a bleeding risk, the patient nevertheless can receive a low dose of anticoagulant (i.e., a form of chemical prophylaxis) because "if it's low dose . . . it doesn't increase the risk of bleeding significantly," and it is therefore used with patients who have had major surgery. Thus, if a patient has a high DVT risk, "you

---

[5]Like Dr. Marik, Dr. Heidbrink is a specialist in internal medicine and critical care medicine.

9

would use both" chemical prophylaxis and SCDs. And, if after the surgery the doctor determines that the patient "truly" has a high risk for bleeding, it is "a time-limited contraindication [for chemical prophylaxis]. It's not a forever contraindication. It's until the risk of bleeding is less." And Rodolfo introduced evidence that Dr. Tiu, in attempting to treat Beatriz's PE, administered Lovenox.

On the other hand, Dr. Gordon told the jury that he did not believe it was safe to give Beatriz chemical prophylaxis at any time while she was at MCA. He explained,

> [Beatriz] had such extensive raw surfaces. Even though a patient may not be actively bleeding— . . . [e]ven though she may not be actively bleeding, I did not feel, nor did any of the other surgeons there feel comfortable in placing her on pharmacologic anticoagulation within the first 24 hours after surgery[.] [T]hat was . . . not an option. Even if . . . I had checked [her hemoglobin concentration] Tuesday morning and it was exactly the same, I'm still not going to order anticoagulation, given the surfaces. It takes longer than, you know, sometimes just a few hours to allow that peritoneal surface, which had been completely removed, to heal back and grow to where that risk of bleeding decreases. It does not decrease just in the first 24 hours.

Dr. Gordon told the jury, "in my professional opinion, if I gave [Beatriz] anticoagulation after surgery, then I think I would be sitting here under an exsanguination trial of how I killed Ms. De La Peña this way." Dr. Heidbrink agreed, stating that had Beatriz been given medication to prevent a DVT, "she would have bled everywhere"; "it would have been a different way for her to expire."

With the evidence presented by Dr. Gordon, even accepting Dr. Marik's testimony that Dr. Gordon should have known that the postsurgical hemoglobin concentration testing at Trinity Park was not accurate and was not an indication of

10

active bleeding, the jury could reasonably find that Beatriz had a high postoperative risk of bleeding and that Dr. Gordon was not negligent in concluding that chemical prophylaxis was contraindicated.

**B. Sufficient Evidence Supports a Finding that Dr. Gordon Properly Ordered SCDs and Reasonably Believed They Were Used.**

Dr. Gordon acknowledged that, given that Beatriz had no chemical prophylaxis, DVT prevention protocol required her to be walking or wearing an SCD. The parties presented contradictory evidence about whether Beatriz wore an SCD while at MCA.

While Dr. Gordon's preoperative orders for Beatriz include an order for Beatriz to wear an SCD at Trinity Park, Dr. Marik testified that the orders did not automatically transfer to and become effective at MCA, even if they were included with the part of her medical chart that Trinity Park sent with Beatriz to MCA. He stated that Dr. Gordon, as the physician admitting Beatriz to MCA, had to write a DVT prevention order specifically for MCA, including ordering an SCD, but that the record is devoid of SCD orders at MCA.

Dr. Gordon, however, testified to the contrary—that he transferred the preoperative orders, including the SCD order, to MCA and that they therefore became effective there. In fact, he had "[n]o doubt at all" that his SCD order was in place at MCA. Dr. Heidbrink agreed with Dr. Gordon that his order from Trinity

11

Park transferred to MCA. He explained, "Perhaps it varies from . . . state to state," but "it's the standard in Texas. That's the way we transfer patients."

As for whether Dr. Gordon negligently relied on the nurses following the SCD order, the parties again presented conflicting evidence. Dr. Gordon testified that he expects nurses to follow his orders and the applicable DVT prevention protocols, and if "the patient is unable to do that," then he expects a nurse to call him. And in Beatriz's chart, at 7:30 a.m. on the 21st, Nurse Cobb included this note: "DVT Guidelines initiated/continued? Y." Although there was some evidence that the nurses did not follow all of Dr. Gordon's orders (as noted below), he testified that at the time he had no doubt that they were following his SCD order. Dr. Heidbrink testified that from his review of the nurses' notes in Beatriz's medical chart from MCA, it appeared that the nurses were following Dr. Gordon's orders for DVT prevention. Dr. Heidbrink further testified that he would expect the MCA nursing staff to carry out Dr. Gordon's orders and, importantly, that it was appropriate for Dr. Gordon to write orders for DVT prevention and then delegate to the nurses the duty of carrying them out.

Both sides also presented conflicting evidence about whether Beatriz wore an SCD as ordered and to the extent necessary to prevent a DVT. Dr. Marik testified that in order for SCDs to work, "they have to be on the patient, on the patient's legs for at least 18 hours a day." Dr. Gordon and Dr. Harrison both testified that Beatriz wore an SCD during the surgery at Trinity Park, and the operating room record for

12

the procedure supports this testimony.[6] Beatriz's husband and daughters testified that at MCA, however, Beatriz did not wear an SCD. Beatriz's MCA records indicate that an SCD was not in place at her admission to MCA on the 20th, was on at 9 p.m. that night, and was off again at 7:30 the next morning. The records contain no other references to whether Beatriz had on an SCD.

However, Dr. Gordon testified that Beatriz was transferred from Trinity Park wearing an SCD and that he saw Beatriz wearing an SCD when he visited her around 6 p.m. on the 20th. Beatriz was admitted to MCA at 3:15 p.m. on the 20th. The jury thus had evidence that she was wearing an SCD through her surgery and transfer, was not wearing one at 3:15 p.m. but was wearing one again by no later than 6 p.m., and was wearing one several hours later. Dr. Gordon further testified that although Beatriz was not wearing an SCD when he saw her on the 21st, the nurses told him that she had just returned to bed after standing. Dr. Gordon explained that it was appropriate for Beatriz not to wear an SCD while standing or walking, as it creates a fall risk. Dr. Heidbrink also testified that SCDs are removed once a patient is walking because when a patient is walking, SCDs are no longer necessary. As discussed below, the jury also heard evidence that Beatriz was up and walking on both the 20th and the 21st.

---

[6]A "pre-op checklist" completed by a Trinity Park nurse left blank the check box next to "SCD's [sic] applied." However, the operating room record states that an SCD was "on functioning prior to induction."

Based on this evidence, the jury could find that Dr. Gordon followed DVT prevention guidelines by ordering that Beatriz wear an SCD and that he was reasonable to rely on the nurses to carry out his orders and to believe that they were doing so. Further, the jury could believe his testimony that he personally saw Beatriz wearing an SCD and the nurse's note that she had one on in the evening of the 20th and could consequently disbelieve her family's testimony that she did not wear them at any point.

## C. Sufficient Evidence Supports a Finding that Dr. Gordon Ordered Beatriz to Ambulate and that She Did So.

As part of his postoperative orders at Trinity Park, Dr. Gordon instructed that Beatriz should "ambulate as tolerated." On the morning of the 21st, he wrote an order at MCA for her to "ambulate with assistance."[7] The parties offered contradictory testimony about whether she did so.

Beatriz's family members testified that while at MCA, Beatriz stayed in her hospital bed except to go to the sink to rinse her throat and to move to a chair for a sponge bath. Dr. Gordon agreed that this minimal amount of walking would not be sufficient ambulation to prevent a DVT. However, Dr. Gordon presented evidence that Beatriz did more walking than what her family described.

---

[7]Dr. Marik defined "ambulating" as "walk[ing] without support at a rate less than running." Other witnesses, including Dr. Gordon, disputed the "without support" part of Dr. Marik's definition for purposes of DVT prevention, asserting instead that as long as a patient is moving her legs, her walking works as DVT prevention.

14

Records from Trinity Park show that on May 20, a Trinity Park nurse called and spoke to Rodolfo, who reported that Beatriz was "up and walking." Rodolfo testified that he did not have that conversation and could not have spoken to the nurse at the time she claimed to have called because he was at work and could not take calls. One of his daughters testified that she and her sister were the only ones at the hospital with Beatriz at that time and were therefore the only ones in the family who had knowledge about whether Beatriz was walking, and they did not tell their father that she was. Nevertheless, the jury could have believed the nurse's note.

As for Beatriz's activity on the 21st, Dr. Gordon testified without objection that Nurse Cobb stated in her deposition that she helped Beatriz walk in the hallway that day and also saw Beatriz walking in the hallway with a family member. (Nurse Cobb was not called to testify, either live or by deposition.) Dr. Gordon testified that he believed Beatriz was walking, that he gave orders for her to walk with assistance, that nurses did not tell him that she was not walking, and that he had no doubt that the nurses were following his orders to have her walk.[8] And, as noted above, he

---

[8]The nurses did not follow all of Dr. Gordon's orders. On the 21st, his written orders included an instruction for Beatriz to shower. However, the nurses' notes state that upon Dr. Gordon's approval, they gave her a sponge bath instead. Dr. Gordon acknowledged at trial that in fact he did not approve the sponge bath instead of a shower. He nevertheless believed the deposition testimony of Nurse Cobb (which he read prior to trial) on the subject of whether Beatriz was walking. He stated, "[S]he didn't take a shower, . . . but I can't say that she was not walking, because . . . Nurse Cobb stated that she walked with the patient in the hallway once and saw her walking in the hallway once with a family member."

15

testified that he expected a nurse to call him if for some reason Beatriz was unable to follow his orders. Further, Dr. Harrison testified that he visited Beatriz on the morning of the 21st and saw her walking with support from a family member and an IV pole. A nurse's notes on the 21st twice indicate that Beatriz did not feel well enough to walk at that time but promised to walk later in the day, but a nurse's note from earlier in the day characterizes her activity as "walks occasionally."

The jury had sufficient evidence to believe that, in accordance with DVT prevention guidelines, Dr. Gordon appropriately ordered Beatriz to ambulate, that he believed her to be walking as ordered, that he was reasonable to believe that the nurses would call him if Beatriz was not walking sufficiently, and that she was walking on the 20th and the 21st, and not just to the sink or a chair in her room.

In summary, the jury heard evidence on which it could base a finding that Dr. Gordon appropriately declined to order chemical prophylaxis, that he appropriately ordered mechanical prophylaxis, that mechanical prophylaxis was employed, that Beatriz was ambulating for DVT prevention, and that Dr. Gordon reasonably believed she was ambulating sufficiently for DVT prevention. Based on this record, applying the appropriate standards of review, the evidence was legally and factually sufficient to support the jury's finding that Dr. Gordon was not negligent. More than a scintilla of evidence supported the jury's finding, and the finding was not against the great weight and preponderance of credible evidence. We overrule Rodolfo's first issue. *See Coronel v. Providence Imaging Consultants, P.A.*, 484 S.W.3d 635, 638 (Tex.

16

App.—El Paso 2016, pet. denied) (stating that in a medical malpractice case, a plaintiff must prove the defendant breached the applicable standard of care); *Parrott v. Caskey*, 873 S.W.2d 142, 149 (Tex. App.—Beaumont 1994, no writ) (stating that a viable cause of action under the Wrongful Death Act requires a showing that the decedent's death was caused by the negligence of the defendant).

## II. The Trial Court Did Not Abuse its Discretion in Denying Rodolfo's Motion for New Trial by Operation of Law.

In his second issue, Rodolfo asserts that the trial court erred in overruling his motion for new trial. We review a trial court's denial of a motion for new trial for abuse of discretion. *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). Because legally and factually sufficient evidence supports the jury's verdict, the trial court did not abuse its discretion in denying the motion for new trial.

## III. The Trial Court Did Not Err in Denying Rodolfo's JNOV Motion.

In his third issue, Rodolfo argues that the trial court erred in overruling his JNOV motion. We disagree. "A motion for JNOV should be granted when the evidence is conclusive and one party is entitled to recover as a matter of law or when a legal principle precludes recovery." *Morrell v. Finke*, 184 S.W.3d 257, 290 (Tex. App.—Fort Worth 2005, pet. denied). Because the evidence did not conclusively

17

establish Rodolfo's right to recover, and he has not argued any legal principle precludes recovery, we overrule this issue. *See id.*; *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (recognizing long-standing rule that error may be waived due to inadequate briefing); *Devine v. Dallas Cty.*, 130 S.W.3d 512, 513–14 (Tex. App.—Dallas 2004, no pet.) (holding party failing to adequately brief complaint waived issue on appeal).

## **CONCLUSION**

Having overruled Rodolfo's three issues, we affirm the trial court's judgment.

/s/ Mark T. Pittman
Mark T. Pittman
Justice

Delivered:  April 4, 2019

18